Nos. 17-50337, 17-50387

# United States Court of Appeals
### FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE

*v.*

JOSE SUSUMO AZANO MATSURA AND
RAVNEET SINGH,
DEFENDANTS-APPELLANTS

*On Appeal From the United States District Court
for the Southern District of California
14CR388-MMA*

**CONSOLIDATED ANSWERING BRIEF
FOR THE UNITED STATES**

ADAM L. BRAVERMAN
  *United States Attorney*

HELEN H. HONG
PHILLIP L.B. HALPERN
BILLY JOE MCLAIN
MARK PLETCHER
  *Assistant U.S. Attorneys
  Criminal Division*

  *880 Front St., Rm. 6293
  San Diego, CA 92101
  (619) 546-6990*

**TABLE OF CONTENTS**

Page

Jurisdiction and Bail Status ........................................ 1
Questions Presented ................................................. 2
Statutory Provisions ................................................ 3
Statement .......................................................... 3
   1.  Indictment ..................................................... 3
   2.  Trial .......................................................... 5
      a. Jose Susumo Azano Matsura ............................... 5
      b. Motive: "Miami West" ................................... 7
      c. Conspiracy to Install San Diego's Mayor ................ 8
      d. Individual Straw Donors for Dumanis Primary
         Campaign for Mayor ..................................... 10
      e. Azano Funds Dumanis PAC With $100,000 .................. 14
      f. Azano Funds Singh's Services on Dumanis
         Campaign ............................................... 17
      g. Azano Backs Filner for Mayor: Straw Donations ......... 22
      h. Azano Funds Singh's Services on Filner
         Campaign ............................................... 25
      i. Filner Wins ........................................... 29
Summary of Argument ................................................ 30
Argument ........................................................... 33
A. Congress Did Not Exceed Its Authority in Banning
   Foreign National Donations in State and Local
   Elections ......................................................... 33
   1.  Standard of Review ............................................ 33
   2.  Congressional Power to Prohibit Foreign National
      Donations ..................................................... 33
   3.  First Amendment ............................................... 42
B. The District Court Did Not Err in Formulating the Mens
   Rea for the Foreign National Campaign Finance Fraud
   Offense ........................................................... 47
   1.  Standard of Review ............................................ 49
C. Sufficient Evidence Supports the Convictions on Counts
   5 through 37 Under 18 U.S.C. § 1519 ............................... 60
   1.  Standard of Review ............................................ 61
      a. Culpable Act or Omission ............................... 62
      b. In Contemplation of an Investigation .................. 71

i

    c. Investigation Is Within the Jurisdiction of the
       United States        74

D. Sufficient Evidence Supports Singh's Participation in
    the Single Conspiracy Charged in Count 1    74
    1.   Standard of Review    76

E. The District Court Did Not Abuse Its Discretion in
    Declining to Sever Singh's Trial From Conspirators'
    Trials    85
    1. Standard of Review    85

F. The District Court Did Not Abuse Its Discretion in
    Declining to Entertain Azano's Ineffective
    Assistance of Trial Counsel Claim    89
    1. Standard of Review    91

G. Section 922(g)(5)(B) Covers Entrants to the United
    States on B1/B2 Visas Is Not Unconstitutionally Vague    98
    1. Standard of Review    98

Conclusion    102
Certificate of Compliance
Statement of Related Cases
Addendum    A1

## TABLE OF AUTHORITIES

Cases:

*Ambach v. Norwick*, 441 U.S. 68 (1979)    35, 44
*Bluman v. Fed. Election Comm'n*,
  800 F. Supp. 2d 281 (D.C. Cir. 2011), affd,
  132 S. Ct. 1087 (2012)    passim
*Bryan v. United States*, 524 U.S. 184 (1998)    49, 53
*Buckley v. Valeo*, 424 U.S. 1 (1976)    42
*Cabell v. Chavez-Salido*, 454 U.S. 432 (1981)    34, 35
*Cullen v. Pinholster*, 563 U.S. 170 (2011)    94, 95
*Foley v. Connelle*, 435 U.S. 291 (1978)    34, 35
*Greenwood v. F.A.A.*, 28 F.3d 971 (9th Cir. 1994)    75
*Harisiades v. Shaughnessy*, 342 U.S. 580 (1952)    37
*Hendricks v. Calderon*,
  70 F.3d 1032 (9th Cir. 1995)    97
*Jackson v. Virginia*, 443 U.S. 307 (1979)    76

*Neder v. United States*, 527 U.S. 1 (1999)    60

*New York State Dept. of Social Servs. v. Dublino*,
   413 U. S. 405 (1973)    102

*Nyquist v. Mauclet*, 432 U.S. 1 (1977)    37

*Oregon v. Mitchell*, 400 U.S. 112 (1970)    39, 40

*Perkins v. Smith*, 370 F.Supp. 134 (D.Md.1974),
   aff'd 426 U.S. 913 (1976)    36

*Pope v. Williams*, 193 U.S. 621 (1904)    40

*Ratzlaf v. United States*, 510 U.S. 135 (1994)    passim

*Strickland v. Washington*, 466 U.S. 668 (1984)    93, 94, 97

*Sugarman v. Dougall*, 413 U.S. 634 (1973)    36, 41

*United States v. Alvarez*, 358 F.3d 1194 (9th Cir. 2004)    85

*United States v. Baker*, 10 F.3d 1374 (9th Cir. 1993)    87

*United States v. Benton*,
   890 F.3d 697 (8th Cir. 2018)    51

*United States v. Bibbero*,
   749 F.2d 581 (9th Cir. 1984)    75, 77, 81, 85

*United States v. Bishop*, 740 F.3d 927 (4th Cir. 2014)    53

*United States v. Blaine Cty., Montana*,
   363 F.3d 897 (9th Cir. 2004)    44. 45

*United States v. Brown*, 623 F.3d 104 (2d Cir. 2010)    92, 95

*United States v. Causey*, 835 F.3d 1289 (9th Cir. 1987)    65

*United States v. Copple*, 827 F.2d 1182 (8th Cir. 1987)    64

*United States v. Curran,* 20 F.3d 560 (3d Cir. 1994)    66, 67

*United States v. Danielczyk*,
   788 F. Supp. 2d 472 (E.D. Va.), opinion clarified on denial
   of reconsideration, 791 F. Supp. 2d 513 (E.D. Va. 2011),
   rev'd, 683 F.3d 611 (4th Cir. 2012), and rev'd in part on
   other grounds, 683 F.3d 611 (4th Cir. 2012)    51

*United States v. Davis*, 663 F.2d 824 (9th Cir. 1981)    86

*United States v. Decoud*, 456 F.3d 996 (9th Cir. 2006)    85, 86

*United States v. Disla*, 805 F.2d 1340 (9th Cir. 1986)    80

*United States v. Escalante*,
   637 F.2d 1197 (9th Cir. 1980)    86, 87, 88

*United States v. Fairchild*, 990 F.2d 1139 (9th Cir. 1993)    65

*United States v. Fernandez*,
   388 F.3d 1199 (9th Cir. 2004),
   modified, 425 F.3d 1248 (9th Cir. 2005)    78, 80, 84, 85, 87

iii

*United States v. Free*, 841 F.2d 321 (9th Cir. 1988)　　86

*United States v. Furminger*,
　652 F. App'x 494 (9th Cir. 2016) (unpublished)　　92

*United States v. Grasso*, 724 F.3d 1077 (9th Cir. 2013)　76, 77

*United States v. Gravenmeir*,
　121 F.3d 526 (9th Cir. 1997)　　100

*United States v. Grovo*, 826 F.3d 1207 (9th Cir. 2016)　　77

*United States v. Harvard*, 103 F.3d 412 (5th Cir. 1997)　　64

*United States v. Henderson*, 243 F.3d 1168 (9th Cir. 2001)　50

*United States v. Hsia*, 176 F.3d 517 (D.C. Cir. 1999)　　51

*United States v. Iriarte-Ortega*,
　113 F.3d 1022 (9th Cir. 1997)　　77

*United States v. Jackson*,
　546 F. App'x 643 (9th Cir. 2013) (unpublished)　　92

*United States v. Jackson*, 621 F.2d 216 (5th Cir. 1980)　　64

*United States v. Jones*, 231 F.3d 508 (9th Cir. 2000)　　33

*United States v. Kanchanaluk*,
　192 F.3d 1097 (D.C. Cir. 1999)　　65

*United States v. Kearney*,
　560 F.2d 1358 (9th Cir. 1977)　　81

*United States v. Kenny*, 645 F.2d 1323 (9th Cir. 1981)　　55

*United States v. Kernell*, 667 F.3d 746 (6th Cir. 2012)　65, 72

*United States v. Kozeny*, 667 F.3d 122 (2d Cir. 2011)　　62

*United States v. Liew*, 856 F.3d 585 (9th Cir. 2017)　　49

*United States v. Liu*, 731 F.3d 982 (9th Cir. 2013)　　56

*United States v. McGowan*, 668 F.3d 601 (9th Cir. 2012)　　94

*United States v. Moore*, 612 F.3d 698 (D.C. Cir. 2010)　　53

*United States v. Nevils*, 598 F.3d 1158 (9th Cir. 2010)　　61

*United States v. Norman*,
　87 F. Supp. 3d 737 (E.D. Pa. 2015)　　63

*United States v. Otis*, 127 F.3d 829 (9th Cir. 1997)　　79

*United States v. Overton*, 573 F.3d 679 (9th Cir. 2009)　　61

*United States v. Patterson*, 819 F.2d 1495 (9th Cir. 1987)　86

*United States v. Reese,* 92 U.S. 214 (1876)　　40

*United States v. Riggins*, 40 F.3d 1055 (9th Cir. 1994)　　76

*United States v. Robertson*, 875 F.3d 1281 (9th Cir. 2017)　98

*United States v. Rowland*,
　2014 WL 3341690 (D. Conn. July 8, 2014)　　65

*United States v. Steele*,
  733 F.3d 894 (9th Cir 2013)              91, 92, 93, 96
*United States v. Taren-Palma*,
  997 F.2d 525 (9th Cir. 1993)                 79
*United States v. Trie*, 21 F. Supp. 2d 7 (D.D.C. 1998)   51
*United States v. Weidner*, 437 F.3d 1023 (10th Cir. 2006)  64
*United States v. Whittemore*,
  776 F.3d 1074 (9th Cir. 2015)               48, 51
*United States v. Whittemore*,
  944 F. Supp. 2d 1003 (D. Nev. 2013), affd. 776 F.3d 1074
   (9th Cir. 2015)                               51
*Zafiro v. United States*, 506 U.S. 534 (1993)        86

Constitution and Statutes:

  U.S. Const. art. I, § 8, cl. 4                   34
  U.S. Const. art. I, § 8, cl. 18                 34
  U.S. Const. art. IV, § 4                 34, 46
  First Amendment                42, 43, 44, 46
  Sixth Amendment                  91, 93, 97
  2 U.S.C. § 441e                        8
  8 U.S.C. § 1101(a)                      99
  18 U.S.C. § 2(b)              65, 67, 69, 71
  18 U.S.C. § 371                       76
  18 U.S.C. § 922                   passim
  18 U.S.C. § 1001                      67
  18 U.S.C. § 1005                      63
  18 U.S.C. § 1519                  passim
  18 U.S.C. § 3231                       1
  28 U.S.C. § 1291                       2
  52 U.S.C. § 30121                  passim
  52 U.S.C. § 30122                   5, 74
  52 U.S.C. § 30109(d)     2, 4, 5, 31, 48, 49, 51, 67
  San Diego Municipal Code § 27.2930         66
  San Diego Municipal Code § 27.2931         66

Legislative Material:

  Sarbanes-Oxley Act of 2002, Pub.L. 107-204, Title VIII, §
   802(a), July 30, 2002, 116 Stat. 800         63

Congressional Record—Senate, S.Amdt. 3240, S8641
  (July 21, 1998)                                        101
  S. Rep. No. 106-146                                      72
S. Rep. No. 107-146                                        62
S. Rep. No. 167, 105th Cong., 2d Sess 11 (1998)       37, 46

Regulations:

  22 C.F.R. § 41.31                                  6, 33, 99

Miscellaneous:

Merriam-Webster Dictionary, https://www.merriam-
webster.com/dictionary/sporting
  (last visited August 7, 2017)                       100-01
9th Cir. Manual of Model Jury Inst. 8.131A               62
9th Cir. Manual of Model Crim. J. Ins. 8.22             75

Nos. 17-50337, 17-50387

# United States Court of Appeals
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
PLAINTIFF-APPELLEE

*v.*

JOSE SUSUMO AZANO MATSURA AND
RAVNEET SINGH,
DEFENDANTS-APPELLANTS

*On Appeal From the United States District Court
for the Southern District of California
14CR388-MMA*

### JURISDICTION AND BAIL STATUS

Jose Susumo Azano Matsura and Ravneet Singh appeal their post-trial convictions stemming from an investigation into campaign finance fraud in San Diego's mayoral election and a federal congressional race in 2012. The district court had jurisdiction under 18 U.S.C. § 3231 because Azano and Singh stood charged with offenses against the United States. Excerpts of Record (ER) 13-35. The district court entered final judgment for Azano on November 3, 2017, sentencing him on 37 counts of conviction to 36 months in custody (concurrent). ER 3-7. The district court entered final judgment for Singh on September 6, 2017, sentencing him on his four counts of conviction to 15 months in custody (concurrent).

1

ER 8-11. Azano and Singh timely filed their notices of appeal on November 9 and September 11, 2017, respectively. ER 1-2. This Court has jurisdiction under 28 U.S.C. § 1291. Singh is not in custody, having been released on bond pending appeal. Azano is in custody until June 2020.

### QUESTIONS PRESENTED

1.  Whether 52 U.S.C. § 30121's prohibition on foreign national contributions in state and local elections exceeds Congress's power to legislate and whether the statute is constitutional under the First Amendment.

2.  Whether the district court erred in articulating the mens rea required to convict under 52 U.S.C. §§ 30121 and 30109(d)(1)(A) in the jury instructions.

3.  Whether sufficient evidence supports the convictions on Counts 5 through 37 under 18 U.S.C. § 1519.

4.  Whether sufficient evidence supports Singh's participation in the single conspiracy charged in Count 1.

5.  Whether the district court abused its discretion in denying a motion to sever Singh's trial from Azano's trial.

6.  Whether the district court abused its discretion by declining to entertain a pre-judgment ineffective assistance of counsel claim, when the issues raised were "broad-based and the

evidentiary record to consider them was sorely lacking" and whether this Court should decline to consider the claim for the same reasons.

7.    Whether the prohibition on gun possession for aliens admitted to the United States under a "non-immigrant visa" under 18 U.S.C. § 922(g)(5)(B) includes entrants to the United States on B1/B2 visas and whether the affirmative defense contained in § 922(y)(2) renders the statute vague.

## STATUTORY PROVISIONS

Pertinent statutory provisions are set forth in the addendum.

## STATEMENT

1.    *Indictment*

In February 2014, a federal grand jury returned an indictment charging four individual and one corporate defendant with illegally conspiring to commit campaign finance fraud violations to influence the 2012 San Diego Mayoral election and to funnel $30,000 in straw donations to the Democratic Congressional Campaign Committee (DCCC).[1] Clerk's Record (R) 1. Two other conspirators were charged in separate cases. See *United States. v. Ernesto Encinas*, 14CR344-MMA (S.D. Cal.); *United States v. Marc*

---

[1]    The United States dismissed the count against Singh's company, ElectionMall. R 831, 834.

3

*Alan Chase*, 14CR926-MMA (S.D. Cal.). Of the six individual defendants charged, four ultimately pled guilty to participating in the scheme, including Azano's bodyguard, one of Azano's personal associates, and his son. Supplemental Excerpts of Record (SER) 5119-89.

A jury convicted the remaining two defendants—Azano and Singh—after trial. R 472, 474, 806. Both were convicted of every count alleged against them in the Third Superseding Indictment that was presented to the jury.[2] *Id.* Azano stood trial on 37 separate counts: Count 1 charged him with conspiring to make unlawful campaign donations as a foreign national, in violation of 52 U.S.C. §§ 30109(d)(1)(A) and 30121(a)(1)(A), and to falsify records in violation of 18 U.S.C. § 1519; Count 3 alleged that Azano donated over $500,000 of his foreign funds to various campaigns in 2012, in violation of 52 U.S.C. §§ 30109(d)(1)(A) and 30121(a)(1)(A); Count 4 charged Azano with making a conduit contribution in connection

---

[2]    Initially, Azano, Singh, co-conspirator Marco Polo Cortes and Azano's son, Edward Susumo Azano Hester were tried together. Ultimately, Cortes and Hester reached plea agreements with the United States after trial. SER 5165-89. In the initial trial, the jury hung on Count 39, charging Azano with unlawfully possessing a firearm as an alien, in violation of 18 U.S.C. § 922(g)(5)(B). R 472. Azano was convicted after a retrial. R 806. The United States elected not to pursue Counts 2 or 38 to verdict.

with a federal election, in violation of 52 U.S.C. §§ 30109(d)(a)(1A) and 30122; Counts 5 through 37 alleged various violations of 18 U.S.C. § 1519 for causing campaigns to file false disclosure reports; and Count 39 charged Azano with unlawfully possessing a firearm as an alien, in violation of 18 U.S.C. § 922(g)(5)(B). ER 13-35. Singh was charged with the campaign finance fraud conspiracy charged in Count 1; the foreign national campaign finance fraud count, in violation of 52 U.S.C. §§ 30109(d)(1)(A) and 30121(a)(1)(A) in Count 3; and two document falsification counts in violation of 18 U.S.C. § 1519, as set forth in Counts 32 and 37. *Id.*

2. *Trial*

The following facts were established over the course of a six-week jury trial.

a. Jose Susumo Azano Matsura

Jose Susumo Azano Matsura is a Mexican citizen of Japanese descent. SER 44, 99. Azano has never been a naturalized United States citizen, nor a lawful permanent resident. SER 353-54. Although Azano maintained homes in Coronado, California (San Diego) and Miami, Florida—and his children and wife lived in the United States as citizens, SER 882, 891-92—Azano himself did not have permission to lawfully reside in the United States. Azano was admitted to the United States beginning in January 2010 solely on

5

a non-immigrant "B1/B2" visa for "personal pleasure and limited business." SER 96, 98; GEX 55-1.[3] A visitor to the United States on a temporary B1/B2 visa is not authorized to reside in the United States, SER 112, and is required to certify that he "intends to leave the United States at the end of the temporary stay," and that he will not work, study, or derive income from activities within the United States. 22 C.F.R. § 41.31; see also SER 5567. B1/B2 entrants are transitory visitors. *Id.*

Azano owned a technology company in Mexico City that sold a product that "could more or less break into and intercept information on peoples' cell phones." SER 2741-42. Azano sold that technology to "different governments," for national security and intelligence gathering functions. *Id.* Azano maintained a home in Mexico, SER 2744, and spent the majority of his time in Mexico or abroad (flying out of San Diego "normally" on Monday morning, "and come back Thursday or Friday"). SER 2742; see also SER 906. Azano's business was lucrative; he was reputed by some to have "more money than god," SER 2451, and held out to be a "Mexican billionaire." SER 1208.

---

[3]    "GEX" designates government exhibits introduced at trial. The United States has concurrently filed a motion to transmit a physical exhibit, which is a DVD containing all of the physical exhibits introduced at trial. "DEX" will designate defense exhibits.

6

b. Motive: "Miami West"

With water view homes in Miami and San Diego, Azano believed that San Diego was "sub-par." SER 1115. Miami offered more luxury, business opportunities, nightlife, and development. SER 910-11, 1115-17, 2797-98. It was "up-to-date, modern [and] chic." SER 143. San Diego, by contrast, was "nothing special," SER 2798, with development plans marred by "RV parks," with "no room for construction" or marinas. SER 146. In Azano's view, San Diego could use more high-rise vertical development, five-star hotels, mixed-use retail and residential space, luxury condominiums, and "deep water dredge marinas where more yachts [could] come." SER 146, 152, 2798, 3779.

Azano's vision for a potential "Miami West" development project represented an over $500-million business opportunity. SER 153. He set his sights on making it a reality. "Any time" he passed the waterfront, or "anytime real estate development would come up," Azano would discuss the development potential with his employees and friends. SER 911. But that kind of project required government buy-in, including potential oversight by the port commission, the Navy, the EPA, and "other entities and forces." SER 2455. That included San Diego's mayor. In Azano's view, a friendly mayor "would help with him getting things he needed to

7

get done." SER 910. The mayor "would help pave the way" for the redevelopment project, "help cut the red tape and push through the permits and the correct zoning area" and work to address "coastal commission issues with buildings downtown that have to be put through the city." SER 1124. As one witness summarized, "Azano was interested in having a friend in the mayor's office" and in having "influence" to pursue his "large scale development" project. SER 2664; see also 1289-90.

In Mexico, Azano could forge relationships with politicians to gain that kind of influence by bankrolling their campaigns. See, e.g., SER 910, 1588. Azano handsomely contributed in those elections, becoming an "important stakeholder" in various campaigns, like the Presidential campaign of Ernesto Cordero in Mexico. SER 1588, 1989. Through those donations, Azano could develop the type of "good relationship[s]" that would benefit his businesses. SER 908-09.

### c. Conspiracy to Install San Diego's Mayor

In the United States, however, federal law flatly prohibits foreign nationals from contributing in any federal, state, or local election. SER 409; 52 U.S.C. § 30121(a)(1). It is a "fundamental rule" of campaign politics. SER 1305. Under § 30121,[4] it is unlawful

---

[4]    The statute was previously codified at 2 U.S.C. § 441e.

for a "foreign national, directly or indirectly, to make" a
contribution or donation to a political party or in connection with a
federal, state, or local election. In order to police these and other
campaign finance restrictions, campaigns are required to file
"disclosure documents," identifying "money and things that are
received" during the campaign. SER 410. Those disclosure reports
promote transparency and allow the public to "evaluate the
financial supporters of candidates before they go to the polls" and
also "continue to evaluate those same candidates when they become
elected officials." SER 411.

Despite those restrictions, Azano hatched an "audacious plan"
to contribute hundreds of thousands of dollars into San Diego
elections to install a San Diego mayor who would support his
development project. SER 41. And to evade restrictions on foreign
national funds, Azano crafted various ways to conceal his identity
from campaign disclosure reports.

Azano's conspirators were vital to the success of the scheme.
Azano provided the money. His conspirators offered the means and
expertise to help him as he pursued increasingly sophisticated ways
to funnel his money into campaign coffers. Ernie Encinas—Azano's
personal body guard and the head of Azano's security team—
provided connections to San Diego's political players. SER 937-38.

9

Encinas was a former San Diego police officer and prior "head of the liquor commission," SER 938, who was connected to the mayoral candidates in 2012. SER 938, 956. Marco Polo Cortes was a "political communications consultant," or lobbyist, "brought in by Ernie [Encinas] to help facilitate meetings and relationships and [be] the setup guy." SER 939. Ravneet Singh self-styled "campaign guru," who offered to build websites and digital campaigns as the owner and CEO of ElectionMall. SER 1586. ElectionMall offered a "one-stop shot of technology to candidates and political parties running for office." SER 1577. Marc Chase was a luxury car dealer and one of Azano's "best friends," SER 2722, who agreed to draw on his associates to serve as straw donors and provide $180,000 in checks from his personal and business accounts to disguise Azano's own donations. SER 2746-47, 2771-72. And Edward Susumo Azano Hester ("Susu") was Azano's 19-year old son, who recruited straw donors himself, SER 915-17, and stood to benefit from his father's influence over San Diego politicians. SER 159-60, 932, 3541, 3742-48; GEX 48-5, 51-8.

> d. Individual Straw Donors for Dumanis Primary
> Campaign for Mayor

San Diego's primary election was scheduled for June 2012. SER 1391. It was a "non-partisan" race, though the race pitted Republican candidates, like then-sitting District Attorney, Bonnie

Dumanis, against Democratic candidates, like Bob Filner. SER 1391-92, 2557. In November or December 2011, Encinas engineered a "meet and greet" between Azano and Dumanis at Azano's Coronado home. ER 3938. After that meeting, Azano decided to throw his support to Dumanis's campaign and committed to fundraise on Dumanis's behalf. As Dumanis told her campaign staff in December 2011, Azano was "very wealthy" and "helping to raise money from his family and friends." GEX 24-1.

One way Azano raised money was by recruiting straw donors to make contributions that he would then reimburse. Each donor would submit a $500 donation check identifying himself as the donor; each concealed that Azano actually funded his donation. Among those Azano tasked with getting "donors" was his employee, Jason Wolter. Azano's son, Susu, asked Wolter to "recruit . . . friends of mine to write a $500 check to the campaign." SER 911. He was told that Azano would reimburse them all. SER 912. Wolter accordingly sent an email on December 21, 2011, asking his friends

11

"to help Susu and His Father support the soon to be Mayor Bonnie
Dumanis."

> Guys,
> I need to get a $500 check from you to help Susu and His Father support the soon to be
> Mayor Bonnie Dumanis. We will give you the cash right away so you won't lose any
> money but your support is appreciated and very much needed. I need to get this from
> you Asap. Text me to let me know when you can meet up.
> Thanks!

GEX 11-1. Seven friends agreed, SER 924, with each submitting
campaign donations, in return for $500 of Azano's cash. *Id.* Wolter
himself donated $500 to the Dumanis campaign, receiving $500
cash reimbursement, as well. SER 931.

Azano also dispatched his friend Marc Chase to recruit straw
donors. SER 2746-47. Chase ultimately delivered 18 $500
contributions from his family and employees, totaling $9,000 in
donations, all reimbursed with Azano's cash. SER 2754, 2757.
Azano's son secured straw donations from his jeweler and jeweler's
friends. SER 573, 579. In total, Azano accounted for at least $15,000
of individual straw donor contributions to the Dumanis campaign
in December 2011 and January 2012. A ledger seized from Azano's
home accounted for each of those donations, identifying how "Susu"

12

collected 17 $500 donations, "Marc" Chase collected $9,000, and "Eliz"abeth Lugo (Azano's assistant), collected 4:



GEX 56-41D. The Dumanis campaign submitted mandatory campaign disclosure forms reporting contributions of $500 from each of those straw donors. GEX 20-9A to 20-9E. None revealed Azano as the true source of funds.

Conspicuously, nearly everyone in Azano's circle—his son, wife, accountant, secretary, son's girlfriend, son's friends, car dealer, car dealer's employees, and bodyguard—donated the maximum allowable $500 to the Bonnie Dumanis campaign in late 2011 and early 2012. See SER 427, 428, 364-65, GEX 20-9A to 20-9E. Notably missing from the list of personal donors: Azano himself,

evidence that he knew he could not personally donate in United States campaigns because he was a foreign national. SER 427-28.

e. Azano Funds Dumanis PAC With $100,000

The straw donor effort proved too demanding for too little. As a result, Azano began to consider PACs as a way to inject large sums to support Dumanis's primary campaign. PACs had no campaign donation limit; a "donor can give an unlimited amount of money to a PAC and any type of corporation or business entity can also give to a PAC." SER 411. But they still maintained the prohibition on foreign national funds. SER 411-12. Azano tasked the head of his security team, Encinas, with shopping independent expenditure committees that supported Dumanis. At least two declined Azano's funds. SER 1205-41. The first was a political consultant aligned with Dumanis. Encinas informed the consultant that "he had donors that wanted to financially support Bonnie's election as Mayor," but wanted an opportunity to "do so independently because their funds were larger than allowed by the County ordinance." SER 1208. Encinas described the donor to the consultant "as a Mexican billionaire who spends time in Coronado," who was willing to make a six-figure contribution. SER 1209-10. In the consultant's words, that kind of donation was "fairly

14

unprecedented" in San Diego, and would have been "one of the largest contributions to the mayoral campaign." SER 1209.

Despite the promise of unprecedented sums, the political consultant was hesitant. *Id*. The "description as a foreign billionaire made [him] concerned that the money may not be eligible for use in the campaign." *Id.*; SER 1214 ("It just sounded fishy[.]"). He also worried about motive: "there didn't seem to be any rationale, in other words, typically people spend money for a reason in politics of that size." SER 1209; see also SER 1214 ("[I]t just, it seemed like a large sum of money, an unusually large sum of money and I didn't understand why, I had never heard of the guy before. He had never been active in politics before. It didn't seem right."). The consultant passed.[5] So did a PAC aligned with the San Diego District Attorneys' Association. SER 1212.

Azano ultimately found a consultant to specially form a PAC just for his money. SER 1314. The consultant was told that the donor would be "the billionaire," and expected a donation from Azano himself. SER 1315. It was therefore a "surprise" when the consultant did not receive a check from Azano's personal account. SER 1320. Instead, a $100,000 check was cut from the bank account

---

[5]    In fact, the consultant felt such suspicions that he told Encinas to check with the San Diego Ethics Commission to learn the "rules and restrictions" governing donations. SER 1215.

for one of Azano's companies—named for the tail number of his personal jet—Airsam N492RM, LLC. *Id.*



GEX 56-37. The campaign disclosure report filed by the PAC accordingly identified Airsam as the source of the funds:

| Schedule A Monetary Contributions Received | | | | Type or print Amounts may be to whole do |
| --- | --- | --- | --- | --- |

SEE INSTRUCTIONS ON REVERSE
NAME OF FILER
San Diegans for Bonnie Dumanis for Mayor 2012, Sponsored by Airsam N492RM, LLC

| DATE RECEIVED | FULL NAME, STREET ADDRESS AND ZIP CODE OF CONTRIBUTOR (IF COMMITTEE, ALSO ENTER I.D. NUMBER) | CONTRIBUTOR CODE * | IF AN OCCUPA (IF SELF |
| --- | --- | --- | --- |
| 05/09/2012 | Airsam N492RM, LLC<br><br>Coronado CA 92118-3205 | ☐IND<br>☐COM<br>☒OTH<br>☐PTY<br>☐SCC | |

GEX 21-13.

Bank records showed, however, that it was not the company's money that funded the $100,000 donation. Indeed, Airsam's bank account did not even have the funds on May 8, 2012 (when the check was written) to fund the $100,000 pledged to Bonnie Dumanis's PAC. SER 2690, 2688. On May 9, Azano infused the bank account

with $125,000 from his personal bank account, as well as $300,000 from one of his Mexican companies, Security Tracking Devices, S.A. SER 2685.

The sheer size of the contribution raised eyebrows. A local newspaper published an article, which quickly traced the money back to Azano, and queried whether the donation was legal because of Azano's immigration status. SER 1325, 3942. After that press, Azano never used Airsam to make political donations again.

### f. Azano Funds Singh's Services on Dumanis Campaign

Apart from straw donations, Azano secretly financed at least $75,000 in internet campaign services from Singh's company for the Dumanis campaign from January to June 2012. None of it was reported in Dumanis's campaign disclosures. SER 432-33.

As early as December 25, 2011, an email from Bonnie Dumanis to her campaign staff reported that she "got a call, a conference call, from Ernie Encinas, Susumo Azano and Ravi Singh." GEX 24-1. Dumanis reported that Azano wanted Dumanis to "talk to [Singh] because he is a master of Internet campaign stuff." *Id.*

Bonnie Dumanis ‹                    @gmail.com›                    Sun, Dec 25, 2011 at 3:05 PM
To: Jen Tierney ‹                @cox.net›, Ron Nehring ‹ron@                 ›, Kevin Klein
‹klein@                    ›, Steven Walker ‹                @gmail.com›, Kelli Marugia ‹kelli@                    ›

Merry Christmas everyone! So, I got a call , conference call, from Ernie Encinas, Susumo Azano  and Ravi Singh.
Ernie has been helping lots with fundraising and introduced Kelli and me to Mr Azano, a client of his security firm. He
is very wealthy. He is helping to raise money from his family and friends.
He has a relationship with Razi and wanted me to talk to him because he is a master of Internet campaign stuff.

He will be in SD tomorrow.... Anyone in town to meet with him? For more info on his company the website
is:Electionmall.com
Otherwise he can Arrange skype meeting call.
It is unclear whether he wants to do some volunteer advising or some form of paid work. I told him about our budget
issues. He has done major campaign work nationally and internationally.
Jennifer, since you are the fiscal conservative on our campaign finances can you talk to him? ( that's supposed to be
funny Ron!)
His cell number is 1              7284... he apparently flew to SD just to talk with Mr A who wanted him to talk to
me!
Very interesting! B
Sent from my iPhone

*Id.*

At Azano's behest, Singh flew from Mexico to San Diego on
Christmas day. GEX 26-1. The next day, Singh met with Jennifer
Tierney, Bonnie Dumanis's campaign consultant. SER 1390-96.
Singh told Tierney that his company, ElectionMall, could help
improve Dumanis's website. SER 1398. Tierney explained that the
campaign had "limited resources," but that Singh could personally
volunteer his time. SER 1399. On the other hand, Tierney told
Singh that he could not volunteer ElectionMall's employees' time.
*Id.* "We discussed what the law was. That no one could pay someone
to volunteer in a campaign. That if any payments were made, those
would have to be reported to the campaign and we would have to
report them on" the campaign disclosure reports. SER 1401,
SER 1460 ("I explained basic campaign laws and rules to Mr. Singh
the first time we spoke[.]").

18

Initially, Singh submitted a work proposal costing $15,000 for set up, $995 a month to maintain the website, and at least $20,000 a month for advertisements. SER 1425-27. Tierney said no. SER 1427. Singh offered a second proposal where the $995 maintenance fee would be reduced to $495. SER 1430-31. Tierney again told Singh "we couldn't afford that." SER 1431. Ultimately, neither Singh nor ElectionMall entered into contracts with the Dumanis campaign for website work. SER 1431-32, 1440. Instead, Singh told Tierney that he would "voluntarily help," so he could "showcase[] . . . his products and services" and "break into the San Diego market[.]" SER 1432, 1455. Singh never told Tierney that he would receive payment from a third party and never disclosed that he would be paid by Azano for his services. *Id.* Accordingly, Tierney did not report any in-kind donations on the campaign disclosure forms. SER 1466. As Tierney testified, "the campaign can only report information that is provided." *Id.* "If a volunteer is paid by a third party and doesn't tell the campaign, . . . that would cause the campaign to file a [disclosure report] omitting the in-kind contribution[.]"*Id.*

Singh soon assembled a team of employees from ElectionMall to assist on Dumanis's campaign, including Director of Web Strategy, Aaron Ronsheim. SER 1577, 1611. As Ronsheim

explained at trial, ElectionMall rebuilt Dumanis's website "from scratch," SER 1611, and purchased and ran millions of display ads on Google, Facebook and Microsoft. SER 1634, 1656, 1665, 1869-70. Singh reportedly had ElectionMall employees working around the clock on Dumanis's campaign efforts. GEX 47-11.

Singh did not volunteer, as he told the campaign; nor was he paid by Dumanis's campaign. SER 1632. Instead, Ronsheim testified that Singh admitted that he was being paid by "Mr. A"— Azano. SER 1632-33, 2247. But Azano did not directly pay ElectionMall. Instead, Singh billed one of Azano's Mexican companies—Broadlink—through one of ElectionMall's affiliates, eSolutions, R&D. And the invoices from eSolutions never directly referenced work on the Dumanis campaign, but used the code word "Betty Boop," or "Betty Boob," SER 1630, 1875:



GEX 50-2. Although Singh billed Azano $100,000 for Dumanis work, Azano ultimately paid $75,000, as part of the "agmt with Ravi." GEX 50-4; SER 1632-38. On April 13, 2012, bank records showed that Broadlink submitted a wire transfer of $175,000 to ElectionMall, which covered the $75,000 owed for Dumanis work. GEX 32-1. Neither Azano nor Singh told the Dumanis campaign about those payments. SER 1432. As far as they knew, Singh was a volunteer. SER 1432, 1455. And when a Dumanis staffer asked Ronsheim "who bought them"—referring to the millions of ads that were purchased on the eve of the election—Ronsheim ignored the question. SER 2253-54.

g.   Azano Backs Filner for Mayor: Straw Donations

Despite the "unprecedented" infusion of nearly $200,000 from Azano, SER 1209, Dumanis lost in the primary election in June 2012. SER 1661. Undeterred, Azano and his conspirators set out to find another candidate to back. They vetted Filner. In early August 2012, Azano hosted a meeting at his home to meet Filner and "make sure they had similar visions." SER 2451-52, SER 933-42. During the meeting, Azano "talked about his vision for San Diego" and developing it "similar to Miami." SER 2453. Filner left the meeting "very inspired." SER 2455.

Azano and his conspirators decided to support Filner. This time, they did not bother with $500 donations. Nor did they use companies, like Airsam, that could trace back to Azano. Instead of using Azano's name or Azano's companies, this time, Azano asked Marc Chase to cut three checks, totaling $180,000, which Azano promised to reimburse with his own funds. SER 2771-72. Chase agreed. *Id.* Chase made out the first check from the account for his luxury car business, South Beach Acquisitions. SER 2781. It was made out to "San Diegans in Support of Bob Filner for Mayor 2012," a Filner PAC, for $120,000. SER 2781-82:



GEX 35-7. Cortes hand-delivered the check to a consultant for Filner's PAC, who testified that he had not "ever seen that size of a check before in a political campaign." SER 2570-71. As part of his "mandatory reporting requirements," the consultant disclosed the donation as one from South Beach Acquisition on the PAC's campaign disclosure forms. SER 2575. There was no reference to Azano in the donation itself or in the campaign disclosure. As the consultant testified, he had no "reason to question whether an entity had been reimbursed for making this contribution," or whether "the true source of the funds was from a foreign national." SER 2578; see also SER 439.

The second check was from another of Chase's businesses, Symbolic Motor Company, for $30,000 to the San Diego County Democratic Party. SER 2786-2787.



GEX 17-37. The final check was a $30,000 check from Chase's personal account to the Democratic Congressional Campaign Committee (DCCC) for use in connection with federal elections (unrelated to the mayoral election). SER 3641.



GEX 17-30. Azano reimbursed Chase for all three checks. SER 2791. None were reported in campaign disclosure reports to have been funded by Azano.

> h. **Azano Funds Singh's Services on Filner Campaign**

When Azano's allegiances pivoted to Filner, Azano summoned Singh to assist his new preferred candidate. Azano now wanted Singh "to do some social media work only for Bob Filner." DEX 2251.

------Original Message------
From: Ernie Encinas
To: Ravi Singh
Subject: Bob Filner
Sent: Aug 20, 2012 2:15 PM

Good afternoon Ravi,
☐
How have you been? Hope all is good with you. Mr Lambo told me to reach out to you to do some social media work only for Bob Filner. We are now supporting him in the San Diego Mayoral race. Can you please call, text, or email☐me as soon as you can, it is very important to him. He☐would like to get started on this immediately, war room and all.

Thank You,

Ernie Encinas | President
Coastline Protection & Investigations
4452 Park Blvd #303
San Diego, Ca 92116
Cell:619-507-4544 | Office:619-255-1248 | Fax:888-604-2240
E-Mail: eencinas@coastlinepi.net
PPO #16663 | PI #22004 | DUNS #033220451 |

Singh flew out to San Diego, and drew up plans to "do a digital war room, social media tactics, email plans, voter data" for Filner's campaign SER 1674. ElectionMall drew up a proposal to start on the Filner campaign, SER 1675, though this time, the proposal was

addressed directly to Ernie Encinas, not anyone on the Filner campaign. SER 1676-77, 1685.

Encinas and Cortes appeared at Filner's campaign headquarters in October 2012, a few weeks before the general election. SER 2636. They met with Filner's campaign manager, Ed Clancy. SER 2624, 2637-39. They offered to "bring somebody in to help . . . to do social media for the campaign." SER 2639. Ravneet Singh and his team showed up at headquarters the next day. SER 2640-41. Singh explained that his team would provide the campaign "higher visibility, outreach, presence overall all across social media platforms[.]" SER 2641. Although they never discussed cost during that meeting, Singh set up a war room in Filner's headquarters that day. *Id.*

Three days later, Clancy asked Singh about the costs of his services. SER 2643-44. Singh assured Clancy, "[d]on't worry. It's taken care of." SER 2644. Singh also stated that he would invoice the campaign a "small amount of money" for "the purchase of websites or website domain names." SER 2645. Singh never told Clancy during that conversation who was paying for Singh's services. SER 2647. Clancy did not learn until a subsequent conversation with another ElectionMall employee that Azano paid for ElectionMall's work. SER 2649. Singh provided a full month of

26

work right up to the general election, but never invoiced the Filner campaign. SER 2650. Filner's campaign, in turn, never reported Singh's services on its campaign disclosure reports or reported Azano's financing of them. SER 2404-05; SER 2650-51; SER 441; GEX 54-3, 54-4, 54-5, 54-6, 54-7.

Of course, Azano did finance the Filner campaign work. SER 1742. Like the Dumanis campaign, the Filner campaign was assigned a code name. Instead of "Betty Boop," Singh dubbed the Filner work "Plastic Man." SER 1687. Those were the only two ElectionMall projects for domestic elections—among hundreds— assigned code names. SER 1584. And instead of directly invoicing Azano for ElectionMall's work, Singh again used eSolutions to invoice Broadlink, just as he had done for Dumanis's campaign. By Election Day, Broadlink had paid eSolutions over $190,000 for Singh's work on the Filner campaign. See GEX 26-14 (email from Singh to Ronsheim, asking for proposal for Filner campaign totaling 105k); 32-4 (invoice for $97,000); 26-16 (resulting Plastic Man proposal created after deposit of funds); 32-13P (invoice for $95,000); 32-6 (email asking for invoice for "95k"); 32-5 (E Solutions bank records reflecting wire transfers from Azano's Broadlink).

Singh took pains to conceal those arrangements. See, e.g., GEX 50-1, 32-4, 32-13P. He repeatedly warned others not to openly

discuss the in-kind services that ElectionMall provided for Dumanis or Filner. In an email on June 1, 2012, Singh wrote, regarding invoices to "Kaliman" (Azano): "This subject cannot be emailed." GEX 32-3. On June 13, 2012, Singh refused to correspond with Encinas about the "PAC" that was to be formed on Dumanis's behalf. He wrote "I am not responding to this email. Because of the legal ramifications. Please talk to me either in person." GEX 48-2. In a June 28, 2013 email about "Old invoices for Mr. A," Singh wrote "Please don't have Cynthia or anyone else send things with a code name. And then list the clients name in a email. That is stupid and dangerous for me." GEX 32-8.

The testimony at trial established that Singh knew Azano's status as a foreign national. Megan Standefer, an employee Singh hired to work on Filner's campaign, for example, testified about what "Mr. Singh may have told [her] about Mr. A's citizenship." SER 2094. She testified "Um, I don't quite remember because after everything happened, I did read I had talked about it and heard stuff, so I didn't want to, I don't want to say that, I can imagine him saying it but I don't want to say with certainty that I heard before I found out what happened, that he was Mexican." *Id.* And in a recorded call with Encinas, Singh agreed to provide election services for a "foreign investor," who would "pay [Singh] direct just

like, you know, Mister A did with you." When Encinas confirmed that the donor is a "foreign national, so he doesn't wanna get involved" and proposed doing "the same thing as we did with Filner," Singh did not protest, but promised to put together a proposal instead. GEX AA-5; SER 3579. Two days later, Singh asked ElectionMall employees for a copy of the "Plastic Man proposal," because "we have another opportunity for the same seat and the same rate." GEX AA-6.

i.    Filner Wins

The money that Azano threw behind Filner "made all the difference," according to campaign insiders, and Filner won. GEX 35-10; see also SER 2660. On inauguration day, Filner enthusiastically greeted Azano, SER 2664, even though Azano appeared nowhere on Filner's donor forms:



GEX 25-1. Within days of the inauguration, Filner was seated at Azano's home, listening to a presentation from developers that Azano had flown in to meet the mayor. SER 169-73.

SUMMARY OF ARGUMENT

The convictions should be affirmed.

1. Section 30121 is constitutional. Congress validly exercised its authority to ensure foreign money does not buy influence from any elected official, or influence the outcome of an election in the United States. It had the authority, as an aspect of its broad power over immigration and naturalization and its authority to take necessary and proper steps to maintain a republican form of government, to limit documented dangers of foreign nationals financially participating in elections within United States borders.

Section 30121 also does not unconstitutionally encroach on the First Amendment rights of temporary visitors to the United States. As the Supreme Court has already reaffirmed, the "government may reserve participation in its democratic political institutions for citizens of this country." *Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281, 286-87 (D.C. Cir. 2011) (three judge court), aff'd 132 S.Ct. 1087 (2012).

2.    The district court properly instructed the jury about the mens rea required to sustain a conviction under §§ 30109 and 30121. It faithfully tracked the definition of willfulness that every court to consider § 30109 has blessed. That formulation required proof that the defendants knew that their actions were unlawful, meaning that they knew that the donation of foreign funds was a crime. The willfulness requirement, combined with the knowledge requirement, means the jury necessarily found that all the defendants understood that Azano's money was from a foreign source and that the donation of the funds was unlawful. No more was required.

3.    Sufficient evidence supported the defendants' convictions for willfully causing campaigns to file false campaign disclosure reports. A rational juror could conclude that Singh and Azano purposely devised ways to donate his funds without disclosing that fact, in order to avoid scrutiny by authorities since they knew foreign nationals could not donate in United States elections.

4.    Sufficient evidence also showed that Singh participated in the one conspiracy charged in the indictment. A rational trier could (and did) conclude that Singh participated in one overarching conspiracy designed to influence the San Diego mayoral election

with Azano's foreign funds and covering up the source of the donations.

5.    The district court did not abuse its discretion by declining to sever Singh's trial from Azano's. They participated in one overarching conspiracy and the jury was properly instructed to compartmentalize any evidence that bore on only one of the two defendants. Indeed, the jury's verdicts—with acquittals and inability to reach a verdict on some counts for other codefendants—reflects that they were well able to consider the evidence for each defendant separately.

6.    The district court did not abuse its discretion in declining to entertain Azano's ineffective assistance of counsel claim. Azano's complaints are "broad-based and the evidentiary record to consider them was sorely lacking," meaning they are better suited for habeas review.

7.    The prohibition on gun possession for aliens admitted to the United States under a "non-immigrant visa" under 18 U.S.C. § 922(g)(5)(B) includes entrants to the United States on B1/B2 visas. It is not rendered vague because an the affirmative defense contained in § 922(y)(2) excludes individuals admitted to the United States for a "lawful hunting or sporting purpose."

## ARGUMENT

A.  Congress Did Not Exceed Its Authority in Banning Foreign National Donations in State and Local Elections[6]

1.  *Standard of Review*: The constitutionality of a statute is reviewed de novo. *United States v. Jones*, 231 F.3d 508, 513 (9th Cir. 2000).

2.  *Congressional Power to Prohibit Foreign National Donations*

a. Section 30121 prohibits foreign nationals from donating in state and local elections.[7] 52 U.S.C. § 30121. Section 30121 is a valid exercise of Congressional power to ensure foreign money does not buy influence from any elected official or influence the outcome of an election in the United States. Congress was well within its authority—as an aspect of its broad power over immigration and naturalization and its authority to take necessary

---

[6]  This section addresses Singh's Opening Brief (RSOB) arguments I and II, set forth on pages 15-29, and Azano's Opening Brief (AOB) argument IV on page 57.

[7]  There is no dispute that Azano is a foreign national and therefore covered by the prohibition. Singh and Azano repeatedly call Azano a "resident" or "long term resident" of the United States in their briefs, citing his property and family ties here. But Azano was *not* a resident of the United States. Under the terms of the B1/B2 visa, he was authorized to enter the United States only for temporary personal and limited business purposes. 22 C.F.R. § 41.31; SER 96, 98.

and proper steps to maintain a republican form of government—to limit foreign nationals' financial participation in any election within United States borders. See U.S. Const. art. I, § 8, cl. 4 ("To establish an uniform Rule of Naturalization, and uniform Laws on the subject of Bankruptcies throughout the United States."); U.S. Const. art. IV, § 4 ("The United States shall guarantee to every State in this Union a Republican Form of Government, and shall protect each of them against Invasion; and on Application of the Legislature, or of the Executive (when the Legislature cannot be convened) against domestic Violence."); U.S. Const. art. I, § 8, cl. 18 ("To make all Laws which shall be necessary and proper for carrying into Execution the foregoing Powers, and all other Powers vested by this Constitution in the Government of the United States, or in any Department or Officer thereof.").

A "democratic society is ruled by its people." *Foley v. Connelle*, 435 U.S. 291, 296 (1978). While an alien is entitled to "the right to education and public welfare, along with the ability to earn a livelihood and engage in a licensed profession, the right to govern is reserved to citizens." *Id.* at 297. As the Supreme Court has long recognized, "[s]elf-government . . . begins by defining the scope of the community of the governed and thus of the governors as well: Aliens are by definition those outside of this community." *Cabell v.*

34

*Chavez-Salido*, 454 U.S. 432, 439 (1981). "[T]he distinction between citizens and aliens, though ordinarily irrelevant to private activity, is fundamental to the definition and government of a state." *Ambach v. Norwick*, 441 U.S. 68 (1979). The "exclusion of aliens from basic governmental processes is not a deficiency in the democratic system, but a necessary consequence of the community's process of political self definition." *Cabell*, 454 U.S. at 439.

As a result, while "foreign citizens in the United States enjoy many of the same constitutional rights that U.S. citizens do," they may be denied certain rights and privileges when democratic self-governance is at stake. *Bluman v. Fed. Election Comm'n*, 800 F. Supp. 2d 281, 286-87 (D.C. Cir. 2011) (three judge court), aff'd 132 S.Ct. 1087 (2012). "For example, the Supreme Court has ruled that the government may bar aliens from voting, serving as jurors, working as police or probation officers, or teaching at public schools," all activities that form part of the political and democratic self-definition process. *Id.* at 283.[8] Those Supreme Court cases

---

[8]     *Id.* at 287 ("See *Cabell v. Chavez–Salido*, 454 U.S. 432, 102 S.Ct. 735, 70 L.Ed.2d 677 (1982) (upholding a law barring foreign citizens from working as probation officers); *Ambach v. Norwick*, 441 U.S. 68, 99 S.Ct. 1589, 60 L.Ed.2d 49 (1979) (upholding a law barring foreign citizens from teaching in public schools unless they intend to apply for citizenship); *Foley v. Connelie*, 435 U.S. 291, 98 S.Ct. 1067, 55 L.Ed.2d 287 (1978) (upholding a law barring foreign

"draw[] a fairly clear line: the government may exclude foreign citizens from activities 'intimately related to the process of democratic self-government.'" *Id.* at 287. A "State's historical power to exclude aliens from participation in democratic political institutions [is] part of the sovereign's obligation to preserve the basic conception of political community." *Id.*; see also *id.* ("[T]he government may reserve participation in its democratic political institutions for citizens of this country.").

Political contributions and express advocacy expenditures are part of the process of democratic self-government that may be limited to citizens and permanent residents. *Bluman*, 800 F. Supp. 2d at 288. Because the Supreme Court "has deemed activities of democratic self-government to include functions as unrelated to the electoral process as teaching in public schools and serving as police and probation officers," it follows that "spending money to influence voters and finance campaigns is at least as (and probably far more) closely related to democratic self-government." *Id.*

_____

citizens from serving as police officers); *Perkins v. Smith*, 370 F.Supp. 134 (D.Md.1974), aff'd 426 U.S. 913, 96 S.Ct. 2616, 49 L.Ed.2d 368 (1976) (upholding a law barring foreign citizens from serving as jurors); *Sugarman*, 413 U.S. at 648–49, 93 S.Ct. 2842 ('citizenship is a permissible criterion for limiting' the 'right to vote or to hold high public office').").

Congress's authority to define individuals who may participate in the political process within United States borders flows from its power over immigration and naturalization. "Congress, as an aspect of its broad power over immigration and naturalization, enjoys rights to distinguish among aliens that are not shared by the States." *Nyquist v. Mauclet*, 432 U.S. 1, 7 n.8 (1977). Any "policy toward aliens is vitally and intricately interwoven with . . . foreign relations and the war power" as well as "the maintenance of a republican form of government" at home. *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952). Congress may therefore further its compelling interest in protecting American democracy from foreign infiltration at all levels of government.

Section 30121 was passed in response to a Senate Committee investigation on "foreign contributions and their effect on the American political system." S. Rep. No. 167, 105th Cong., 2d Sess 11 (1998) ("Thompson Committee Report"). The Thompson Committee Report was nearly 10,000 pages long, and cataloged numerous instances of foreign nationals gaining access to political leaders through campaign contributions and donations. For example, the investigation revealed efforts by agents of the Chinese government to devise "a seeding strategy of developing viable

candidates sympathetic to the [People's Republic of China] for future federal elections . . . and financing American elections through covert means." *Id.* at 47, 2501-2512. Those efforts included not only federal elections, but "state elections as well." *Id.* at 2509. The Report identified a foreign national, for example, who donated $100,000 to the elected state treasurer of California, who had responsibility for investment of billions of dollars in pension assets. *Id.* at 971-972, 5576-5581, 5584.

As a result of the Report findings, Congress passed the current version of section 30121 in 2002, making it unlawful for a "foreign national, directly or indirectly, to make" a contribution or donation in connection with a federal, state, or local election. Section 30121 was thus narrowly tailored to address the "compelling interest of limiting participation of non-Americans in the activities of democratic self-government"—whether at the local, state, or federal level—and was a proper exercise of Congressional authority. *Bluman*, 800 F. Supp. 2d at 288.

b. Singh and Azano nonetheless contend that section 30121's prohibition encroaches on state power to determine how state and local elections are run. As they put it, Congress lacks "the authority to determine voting and election rules at the state and local level." RSOB 15. In support of their contention, they reference

various law review articles and cases like *Oregon v. Mitchell*, 400 U.S. 112 (1970), suggesting that states reserve the right generally to oversee their state election processes. While that may be true, section 30121 is not an election-oversight statute. It does not regulate how local elections are conducted; it does not prescribe when or where local elections must take place; it does not identify who, among citizens, may vote in local elections. Instead, it simply limits financial participation in American elections to those with permanent, lasting and legally recognized ties to the United States: citizens and lawful permanent residents. That is a "compelling interest" that the Supreme Court has blessed as an appropriate and necessary part of the process of self-governance, and one that Congress may advance through its power over immigration, naturalization, and preserving the United States's republican form of government.

None of the cases Azano or Singh cites disturbs that conclusion. RSOB 15-20. Those cases touch on congressional authority to impose federal laws or regulations on state elections, as they relate to *citizens*—and have nothing to do with Congress's plenary authority to preserve a republican form of government, oversee foreign relations, and set laws related to immigration by limiting foreign national influence in campaigns. *Oregon v.*

*Mitchell*, for example, considered only whether the federal government could require states to accept votes from "18-year-old *citizens* in state and local elections." 400 U.S. 112, 112 (1970) (emphasis added). *Pope v. Williams*, 193 U.S. 621, 632 (1904), considered whether a *citizen* of the United States had a constitutional right to vote in a state election, even though he had failed to comply with registration requirements under state law. *United States v. Reese*, 92 U.S. 214, 215 (1876), considered whether a general federal statute could be used to criminally charge inspectors of a municipal election who refused to count the vote of "a *citizen* of the United States of African descent." *Id.* (emphasis added). None of those cases forbids Congress from excluding aliens from the democratic processes of self-governance by limiting their financial contributions in local, state or federal elections. *Bluman* makes this very point: cases that deal with prohibitions on non-aliens are irrelevant to the analysis involving aliens. As the three-judge panel in *Bluman* explained:

> The compelling interest that justifies Congress in restraining foreign nationals' participation in American elections—namely, preventing foreign influence over the U.S. government—does not apply equally to minors, corporations, and citizens of other states and municipalities. It is long established that the government's legislative and regulatory prerogatives are at their apex in matters pertaining to alienage. It is

40

> hardly surprising, therefore, that a law that is justified
> as applied to aliens may not be justified as applied to
> citizens of the United States, or entities made up of such
> citizens. Thus, the fact that those other non-voting
> groups of U.S. citizens are free to contribute and make
> expenditures does not mean that foreign nationals are
> similarly entitled.

*Bluman*, 800 F. Supp. 2d at 290. It cannot be beyond Congress's

power to prevent foreign citizens from pumping funds into local and

state governments to set up foreign enclaves within United States

borders. If Canadians citizens decided that they wanted to install

favored officials in all towns on the northern border by flooding local

elections with foreign national funds, Congress would certainly be

acting within its power to thwart it. Congress has elected to prevent

and punish such attempts at infiltration by enacting section 30121,

thereby protecting all elections within United States borders from

foreign influence.

It does not matter that some local jurisdictions may permit

aliens to vote, as Azano and Singh contend. RSOB 17. Even if some

jurisdictions permit non-citizens to vote, that is a matter of grace,

not constitutional requirement. *Sugarman v. Dougall*, 413 U.S.

634, 649 (1973) (holding that "citizenship is a permissible criterion"

in limiting voting rights). Moreover, Congress's measured response

to the Thompson Committee Report by addressing the pressing

harms—foreign money that could buy influence in American

41

politics—does not somehow divest Congress of the authority to act simply because it did not go further in denying all aliens the right to vote at all. Cf. *Buckley v. Valeo*, 424 U.S. 1, 105 (1976) (Congress may "take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind"); *Bluman*, 800 F. Supp. 2d at 291 ("But as the Supreme Court has stated, Congress may proceed piecemeal in an area such as this involving distinctions between citizens and aliens."). Congress's choice to limit section 30121's reach to elections was an appropriate, incremental response to the Thompson Committee Report. And it was a choice well within Congress's broad power over immigration and naturalization and the maintenance of a republican form of government.

3.    *First Amendment*: Section 30121 is not unconstitutional under the First Amendment, either. See RSOB 20-29. In *Bluman*, a three-judge court confronted the same question presented here: are the political contribution and express-advocacy expenditure restrictions set forth in section 30121 unconstitutional under the First Amendment? The court concluded that section 30121 is a constitutional exercise of the United States's authority to oversee its democratic self-governance. The Supreme Court affirmed that holding. That outcome is controlling here.

42

In *Bluman*, two foreign citizens living and working in the United States on temporary visas challenged section 30121. One had resided in the United States since 2006, with a visa that permitted him to work as an associate at a law firm in New York until November 2012, when he would apply for another three-year term. The other worked as a medical resident at a hospital in New York on a three-year visa, with eligibility to apply for a seven-year extension. 800 F. Supp. 2d at 285. Both sought to contribute to federal candidates; one wanted to contribute to a state election candidate; the other wanted to contribute to a political party; one wanted to make independent expenditures on behalf of the President to print flyers; and one wanted to donate to an independent organization that advocated "on behalf of certain issues and candidates." *Id.* All of those activities are prohibited by section 30121. The two plaintiffs sued, contending that section 30121 unconstitutionally abridges their First Amendment rights.

The three-judge court found no constitutional infirmity in the restrictions. As the court explained,

> It is fundamental to the definition of our national political community that foreign citizens do not have a constitutional right to participate in, and thus may be excluded from, activities of democratic self-government. It follows, therefore, that the United States has a

> compelling interest for purposes of First Amendment analysis in limiting the participation of foreign citizens in activities of American self-government, and in thereby preventing foreign influence over the U.S. political process.

*Id.* at 288; see also *id.* at 290 ("A statute that excludes foreign nationals from political spending is therefore tailored to achieve that compelling interest."). This is particularly so since section 30121 does not prohibit foreign nationals from speaking out on matters of public policy. By regulating only campaign-related spending, Congress has tailored section 30121 to address the financial activity most likely to influence elections. Cf. *Ambach*, 441 U.S. at 79 n.10 ("[The statute] does not inhibit [noncitizens] from expressing freely their political or social views or from associating with whomever they please. Nor are [noncitizens] discouraged from joining with others to advance particular political ends.").

The Supreme Court affirmed. *Bluman,* 132 S.Ct. 1087 (2012). The Supreme Court's affirmance "bind[s] lower courts," including this one, "unless subsequent developments suggest otherwise." *United States v. Blaine Cty., Montana*, 363 F.3d 897, 904 (9th Cir. 2004). "Although [it] is true in the sense that the Supreme Court is more willing to reconsider its own summary dispositions than it is to revisit its prior opinions, this principle does not release the lower courts from the binding effect of summary affirmances. As the

44

[Supreme] Court itself has instructed, 'inferior federal courts had best adhere to the view that if the Court has branded a question as unsubstantial, it remains so except when doctrinal developments indicate otherwise.'" *Id.*

Neither Singh nor Azano point to doctrinal developments that would undermine the controlling effect of *Bluman*. Instead, they suggest that *Bluman* "only answers a subset of the question" presented, "for it did not reach the question of foreign nationals' participation in *state and local* elections." RSOB 23. That is simply untrue. The court expressly rejected one of the plaintiff's claims that he should be permitted to donate in connection with a state election. *Bluman*, 800 F. Supp. 2d at 282 ("They seek to donate money to candidates in U.S. federal and *state elections*"); *id.* at 285 ("Bluman wants to contribute to three candidates: Representative Jay Inslee of Washington; Diane Savino, *a New York state senator*; and President Obama"). The analysis in *Bluman* therefore squarely controls.

Even if it did not, the analysis in *Bluman* applies with equal force here. Singh and Azano suggest that the United States would be "hard pressed to articulate a compelling federal governmental interest in defining the community of who can vote and contribute to local elections[.]" RSOB 23. But as set forth above, Congress does

have a compelling interest in preventing foreign influence from infiltrating state and local governments. As the Thompson Committee Report showed, foreign nationals had contributed hundreds of thousands of dollars to state candidates who would control millions of dollars in pension funds. S. Rep. No. 167, 105th Cong., 2d Sess 11 (1998). Congress is also responsible in ensuring a republican form of government and protecting the United States (including its constituent states and cities) from foreign influence. Const. art. IV, § 4. Nor does it matter, as Singh contends, that U.S. subsidiaries of foreign corporations may contribute or that foreign nationals may be permitted to participate in ballot initiatives. RSOB 25-27. Presented with the same arguments about underinclusiveness (indeed, involving ballot initiatives), the court in *Bluman* concluded that Congress may legislate on a piecemeal basis, without undermining its compelling interest.[9] *Bluman*, 800

---

[9]     Azano later attacks his conviction on Count 33 as a violation of First Amendment principles, too. AOB 56. He contends that Airsam's donation of $100,000 to the Dumanis PAC fell within the first amendment rights of his United States corporation. *Id.* That misses the point of the prosecution: Azano was not prosecuted because some United States corporation lawfully donated to a PAC. Instead, he was prosecuted because he used Airsam—just as he used the dozens of $500 straw donors—to launder his own foreign funds into United States elections. The money donated was not from Airsam, but Azano.

F. Supp. 2d at 291 ("Plaintiffs further contend that the statute is underinclusive and not narrowly tailored because it permits foreign nationals to make contributions and expenditures related to ballot initiatives. But as the Supreme Court has stated, Congress may proceed piecemeal in an area such as this involving distinctions between citizens and aliens.").

B.  **The District Court Did Not Err in Formulating the Mens Rea for the Foreign National Campaign Finance Fraud Offense**[10]

Section 30121 sets forth the prohibition on foreign national donations in connection with a federal, state, or local election. Section 30109 makes a violation of section 30121—as well as the other campaign finance prohibitions—a crime, but only if the violation is committed "knowingly and willfully." That penalty provision provides:

> (d) Penalties; defenses; mitigation of offenses
> (1)(A) Any person who *knowingly and willfully* commits a violation of any provision of this Act which involves the making, receiving, or reporting of any contribution, donation, or expenditure--

---

[10]  This section addresses Singh's Opening Brief argument III, set forth on pages 29-33, and Azano's Opening Brief argument II, set forth on pages 44-50. These arguments do not touch on Azano's conviction on Count 4—the straw donor count in connection with a federal election—since it does not require proof of an illegal foreign national donation.

>  (i) aggregating $25,000 or more during a calendar year
>  shall be fined under Title 18, or imprisoned for not more
>  than 5 years, or both[.]

52 U.S.C. § 30109(d)(1)(A) (emphasis added). In accordance with the statute, the district court instructed the jury that they could find Azano and Singh guilty of Count 3 only if they found that the defendants had acted "knowingly and willfully." The district court faithfully tracked the model instruction definition of knowingly and followed this Court's instructions in *United States v. Whittemore*, 776 F.3d 1074 (9th Cir. 2015) in providing a definition of "willfully." SER 5214-17.

Azano and Singh nonetheless complain on appeal that the district court erred in instructing the jury about the mens rea required to establish a conviction under section 30109. Both contend that the instructions should have included a "specific intent" requirement as set forth in *Ratzlaf v. United States*, 510 U.S. 135 (1994), which would have required proof of a "specific intent to evade or defeat" section 30121 in particular—in other words, knowledge that the prohibition is set forth in a specific statute and that the defendants intended to evade that particular provision.[11] AOB 47 n.27; see also RSOB 32-33. Singh also contends

---

[11]    Below, neither Azano nor Singh requested this heightened burden. Azano's proposed willfulness instruction mirrored the

that the district court erred by not instructing the jury that "knowledge of Azano's immigration status was a material element of the crime." RSOB 29. Both are mistaken. The *Ratzlaf* formulation of willfulness has been rejected by every court to consider it in the context of § 30109; the *Bryan* standard—as the district court offered here—has been found appropriate. *Bryan v. United States*, 524 U.S. 184, 193 (1998). That formulation required proof that the defendants knew that their actions were unlawful, meaning that they knew that the donation of foreign funds was a crime. The willfulness requirement, combined with the knowledge requirement, means the jury necessarily found that all the defendants understood that Azano's money was from a foreign source and that the donation of the funds was unlawful.

1.   *Standard of Review*: The formulation of jury instructions is reviewed for an abuse of discretion. Whether instructions correctly state the elements of an offense is reviewed de novo. *United States v. Liew*, 856 F.3d 585, 595–96 (9th Cir. 2017). "The 'relevant inquiry is whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation.'" *Id.*

---

instructions that the district court actually delivered. SER 5335-37. Singh's proposed definition also did not recommend the heightened standard. SER 5388.

49

2.    a.    "The word 'willfully' is sometimes said to be 'a word of many meanings' whose construction is often dependent on the context in which it appears." *Bryan*, 524 U.S. at 191. As used in federal criminal statutes, willfully can take two different meanings. The first is known as the *Ratzlaf* standard, which is the heightened standard applied when "the criminal conduct is contained in a regulation instead of a statute, and when the conduct is not obviously unlawful[.]" *United States v. Henderson*, 243 F.3d 1168, 1172 (9th Cir. 2001). This heightened standard is required with "highly technical statutes that present[] the danger of ensnaring individuals engaged in apparently innocent conduct . . . carving out an exception to the traditional rule that ignorance of the law is no excuse." *Razlaf*, 510 U.S. at 194-95. *Ratzlaf*'s willfulness standard requires proof that the defendant knows of the specific legal duty he breaches, or the particular law, that makes his conduct unlawful. *Id.* at 822.

*Bryan* sets forth the generally applicable willfulness standard. Under *Bryan*, willfulness requires proof that a "defendant acted with an evil-meaning mind, that is to say, that he acted with knowledge that his conduct was unlawful." *Bryan*, 524 U.S. at 193. The defendant must be aware that the act with which

he is charged is unlawful; he need not know why it was unlawful, i.e., aware that a federal law prohibited the conduct. *Id.*

Every court to address § 30109 has concluded that § 30109 adopts the *Bryan* standard of willfulness.[12] It does not require proof that a defendant know that his conduct violates a *specific* law or statute, as Azano and Singh now contend, only that what he is doing is unlawful. As the Eighth Circuit recently observed, campaign finance crimes do not fall within the class of "highly technical statutes that present[] the danger of ensnaring individuals engaged in apparently innocent conduct." *Benton*, 890 F.3d at 715. The court there accordingly blessed a willfulness instruction that read:

> A person acts willfully if he acts knowingly, purposely, and with the intent to do something the law forbids. That is, a person acts willfully when they act with the purpose to disobey or to disregard the law. A person need not be aware of the specific law or rule that his

---

[12]    See *United States v. Benton*, 890 F.3d 697, 715 (8th Cir. 2018); *United States v. Whittemore*, 944 F. Supp. 2d 1003, 1010 (D. Nev. 2013), aff'd, 776 F.3d 1074 (9th Cir. 2015); *United States v. Whittemore*, 776 F.3d 1074, 1080-81 (9th Cir. 2015); *United States v. Trie*, 21 F. Supp. 2d 7, 16 (D.D.C. 1998); *United States v. Hsia*, 176 F.3d 517, 522 (D.C. Cir. 1999); *United States v. Danielczyk*, 788 F. Supp. 2d 472, 491 (E.D. Va.), opinion clarified on denial of reconsideration, 791 F. Supp. 2d 513 (E.D. Va. 2011), rev'd, 683 F.3d 611 (4th Cir. 2012), and rev'd in part on other grounds, 683 F.3d 611 (4th Cir. 2012).

conduct may be violating, but he must act with the intent to do something that he knows the law forbids.

*Id.*

The district court here did the same. At Singh's request, it provided the jury two separate instructions for the offense: one that governed Azano's principal liability, and one that governed Singh's aiding and abetting liability. SER 5214-5217. Both required the jury to find that Azano was a foreign national; either that Azano himself made a donation or contribution in connection with a federal, state or local election or that Singh aided, counseled, commanded or induced Azano to make the donation; that the contributions aggregated to $25,000 or more; and that the defendant "acted knowingly and willfully." SER 5214, 5215. In the same instruction, the district court defined the mens rea. The district court instructed that

> An act is done knowingly if the defendant is aware of the act and does not act through ignorance, mistake or accident.

> An act is done willfully if the defendant acted with knowledge that some part of his course of conduct was unlawful and with the intent to do something the law forbids, and again not by mistake or accident. In other words, a person acts "willfully" when he acts with a bad purpose to disobey or disregard the law.

It is not necessary for the government to prove that the defendant was aware of the specific provision of law that he is charged with violating. Rather, it is sufficient for the defendant to act knowing that his conduct is unlawful, even if he does not know precisely which law or regulation makes it so.

SER 5214-17. That properly tracked the requirements of *Bryan* and adequately set forth the mens rea to commit a campaign finance fraud offense.[13]

The district court's standard *Bryan* instruction was not in tension with *Bluman*, as Azano suggests. AOB 46. In *Bluman*, the court cautioned "the government that seeking criminal penalties for [§ 30121]—which requires that the defendant act 'willfully'—will require proof of the defendant's knowledge of the law." 800 F. Supp. 2d at 292. It supported that point by citing to *United States v. Moore*, 612 F.3d 698, 703 (D.C. Cir. 2010), which described "knowledge of the law" to be *Bryan*'s general willfulness standard:

---

[13] Azano also contends that the rule of lenity should command use of the *Ratzlaf* standard. AOB 49-51. Because "willfully" has an accepted meaning under *Bryan*, and because *Ratzlaf* is considered an exception reserved for highly technical statutes, courts have routinely rejected this line of argument See, e.g, *United States v. Bishop*, 740 F.3d 927, 934 (4th Cir. 2014) ("Exceptions to such a venerable rule should be construed narrowly in the absence of clear congressional intent to the contrary. We discern nothing in the language or purpose of the statute to suggest that Congress wished to jettison altogether the bedrock presumption that each of us knows the standards applicable to our personal conduct.").

"In *Bryan*, the Supreme Court summarized the rule quite clearly: '[I]n order to establish a willful violation of a statute, the Government must prove that the defendant acted with knowledge that his conduct was unlawful.'" *Id. Bluman* therefore did not purport to require proof that a violator knew of the particular law— § 30121, here—that he violated; only that he knew that he wasn't allowed to donate campaign funds because he was a foreign national. The district court's instructions adequately covered that requirement.[14] SER 5214-17.

b.      Singh separately contends that the district court should have also explicitly instructed the jury that "Singh knew

---

[14]      In passing, Azano suggests that the willfulness instruction could allow a jury "to convict after finding any violation of an election law," like the municipal code limits of $500 for local elections. AOB 50-51. That has no foundation in the facts. The United States never claimed—and no one ever argued—that Azano or Singh could have been convicted under § 30121 if they believed their acts were unlawful only because they had exceeded individual campaign contribution limits. And the facts showed that could not have been the case. For example, if the unlawful intent bore only on campaign limits, the fact that Azano himself did not donate makes no sense. Why not submit a $500 check? It also does not explain any of the straw donations for PACs, which were unlimited in their contribution limits. If Azano was not worried about the foreign national restrictions, he surely would have used Airsam openly to continue to donate. He did not. There was a union here between the mens rea and the unlawful act, which the jury instructions required (and which the facts, in any event, established beyond a reasonable doubt).

Azano's citizenship status." RSOB 30-32. While Singh may quibble with the district court's formulation of the instruction, that is precisely what the jury instructions required, and it was a point on which all the parties agreed. See, e.g., SER 4629 (prosecutor agreeing "We have to prove that the defendant knew that he was a foreign national. We have to prove because they knew that because he was a foreign national he could not donate."); *United States v. Kenny*, 645 F.2d 1323, 1337 (9th Cir. 1981) ("The jury must be instructed as to the defense theory of the case, but the exact language proposed by the defendant need not be used, and it is not error to refuse a proposed instruction so long as the other instructions in their entirety cover that theory."); see also generally SER 5397-5400, 5408-36.

The jury instructions required the jury to find that Singh acted "knowingly and willfully." SER 5216-17. In the context of this case, that meant that the jury had to find that his effort to aid Azano in making foreign contributions was unlawful. SER 5217. That necessarily required Singh's predicate understanding that Azano was a foreign national. If the mens rea instructions were not enough, the district court's other instructions made that requirement abundantly clear. The court instructed the jury that it had to find that Singh "acted with the intent to facilitate the crime

of making donations and contributions of a foreign national[.]" SER 5216. As it further instructed, that required proof "beyond a reasonable doubt that the defendant acted with the knowledge and intention of helping [Azano] to commit the crime of making donations and contributions by a foreign national[.]" SER 5217. "A defendant acts with the intent to facilitate the crime when the defendant actively participates in the criminal venture with advance knowledge of the crime and having acquired that knowledge when the defendant still had a realistic opportunity to withdraw from the crime." *Id*.[15] If Singh was blissfully unaware of Azano's status, he could not have "acted with the intent to facilitate the crime of making donations and contributions of a foreign national," with the "advance knowledge of the crime."

The straightforward understanding of those requirements was borne out by the arguments at trial. Indeed, Singh's primary defense was that he did not know Azano was a foreign national. As his attorney began in closing argument,

---

[15] Because of these additional requirements, *United States v. Liu*, 731 F.3d 982, 983 (9th Cir. 2013) is of no help to Singh. RSOB 30-31. There is no ambiguity here about what "knowing" modifies, and in any event, the specific intent to facilitate a crime and the willful commission of it required a jury finding that Singh knew all of the predicate elements.

the question is not whether in fact Mr. Azano is not a U.S. citizen and doesn't have a green card, but whether or not Mr. Cortes, Mr. Singh, and perhaps even his own son, knows that. Because if you can't prove, if the government doesn't prove to you beyond a reasonable doubt that Mr. Singh knew at the time we're talking about, which is late '11 and 2012, if Mr. Singh did not know that Mr. Azano was not a citizen and didn't have a green card, then you should acquit him on all the charges that involve the contribution by a foreign national because they have to convince you that he knew that. Because if he doesn't know it, what's the crime?

SER 5951. He then devoted the next 14 pages to that argument. SER 5951-5964; see also SER 5963 ("The government has absolutely failed to prove beyond a reasonable doubt that Ravi Singh knew that Mr. Azano was not a citizen nor a green card holder and therefore was ineligible to do anything. And if in fact you agree with that statement—if you, right out of the box, agree with my statement that the government has absolutely failed to prove beyond a reasonable doubt . . . if you agree, then insofar as Ravi Singh is concerned on the donation by foreign national issues, you can stop. You're done. You should acquit him."). The United States rebutted it with all the facts that showed Singh knew. SER 4968-72; SER 4980 ("He knew Mr. Azano was a foreign national and he knew Mr. Azano was paying for this work[.]").

The jury rejected Singh's defense. The jury's finding is well supported by the weight of the evidence, including:

- In a recorded call with Encinas, Singh agreed to provide election services for a "foreign investor," who would "pay [Singh] direct just like, you know, Mister A did with you."

- Megan Standefer, an employee Singh hired to work on Filner's campaign, testified about what "Mr. Singh may have told [her] about Mr. A's citizenship." SER 2094. She testified "I can imagine him saying it but I don't want to say with certainty that I heard before I found out what happened, that he was Mexican." *Id.*

- Azano had a long-running relationship with Singh, which led to significant work for Singh in Mexico. Among other things, Singh's ElectionMall provided services to a Mexican Presidential candidate in 2011, which was funded by Azano. SER 1588. Singh also did work for Azano's Mexican businesses. Singh traveled to Mexico with Azano. And Singh did a "SEO" (search engine optimization) project related to Azano and his companies' online presence. See, e.g., Singh Ex. 2429. Their close personal and business relationship allowed the jury to conclude that Singh knew Azano was a foreign national.

- Singh was a self-professed "campaign guru" and the CEO of ElectionMall, a company that offered a suite of election-related technology for political candidates. SER 1586-87. He had run ElectionMall since 2003. SER 1580. Singh had also been a candidate for political office in Illinois in the late 1990s. *Id.* He was therefore aware of the "one law . . . that would have impact nationwide," which is the "federal law that restricts the source of contributions . . .coming from foreign nationals." SER 409.

- Singh's effort to hide the work he did on the Dumanis and Filner campaigns showed that Singh knew his activity was unlawful because Azano could not donate. Singh did not use code names for ElectionMall's projects. SER 1584 ("No we didn't use codenames). Yet, he tried to obscure the work he was doing for Azano. See, e.g., GEX 50-2 ("code name Betty Boob"), 26-16 ("project: Plastic Man"). He billed Azano's Mexican company, Broadlink for the work from the billing account for eSolutions R&D. See GEX 50-1, 32-4, 32-13P. And he repeatedly warned others not to openly discuss the in-kind services that ElectionMall provided for Dumanis or Filner. In an email on June 1, 2012, Singh wrote regarding invoices to Azano: "This subject cannot be emailed." GEX 32-3. On June 13, 2012, Singh refused to correspond with Encinas about the "PAC" that was to be formed on Dumanis's behalf. He wrote "I am not responding to this email. Because of the legal ramifications. Please talk to me either in person." GEX 48-2. In a June 28, 2013 email about "Old invoices for Mr. A," Singh wrote "Please don't have Cynthia or anyone else send things with a code name. And then list the clients name in a email. That is stupid and dangerous for me." GEX 32-8.

In the context of this case—where the United States's entire prosecution theory rested on the existence of a scheme to conceal Azano's status as a donor because all the parties knew he was a foreign national who could not donate—it is hard to understand Singh's complaint. The district court properly instructed the jury and it necessarily found beyond a reasonable doubt the element that Singh contends is lacking. Since this was the very crux of the case, any error in not parsing the elements finer is harmless beyond

a reasonable doubt. See *Neder v. United States*, 527 U.S. 1, 15 (1999).

C. Sufficient Evidence Supports the Convictions on Counts 5 through 37 Under 18 U.S.C. § 1519[16]

Counts 5 through 37 charged Azano and Singh with willfully causing campaigns to submit campaign disclosure records that were false. ER 29-33. Counts 5 through 31 and 33 through 36 each alleged that campaign disclosure reports contained false entries because they identified straw donors as the source of donations, rather than Azano. Those counts included each of the $500 straw donations submitted to Bonnie Dumanis, the $100,000 check to Dumanis's PAC from an "Airsam" account, $30,000 from March Chase to the DCCC, $120,000 for a Filner PAC submitted by South Beach Acquisitions, and $30,000 to the San Diego County Democratic Party from Symbolic Motors (or West Coast Acquisitions). ER 30-33. The United States alleged that because the conspirators hid the identity of the true donor from the campaign (specifically to evade the foreign national restrictions on donations) and instead reported someone else's name, they willfully caused the campaign to submit disclosure reports with false information.

---

[16] This section addresses Singh's Opening Brief argument IV, set forth on pages 34-50, Azano's Opening Brief argument III, set forth on pages 53-57, and the amicus brief filed by California Campaign and Election Law Attorneys.

Counts 32 and 37 charged Azano and Singh with causing false entries on the campaign disclosure reports that omitted the fact that Azano in fact paid for Singh's work.

Azano and Singh now challenge those convictions, principally contending that there was insufficient evidence of every element required to sustain a § 1519 offense.[17] For the reasons set forth below, sufficient evidence supported the counts and the convictions should be affirmed.

1. *Standard of Review*: Sufficiency of the evidence claims are reviewed de novo. *United States v. Overton*, 573 F.3d 679, 685 (9th Cir. 2009).

2. In considering a challenge to the sufficiency of evidence, this Court must "view the evidence in the light most favorable to the prosecution." *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010). That means that "when faced with a record of conflicting inferences, a reviewing court must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Id.* (internal quotations omitted). This Court then

---

[17] Both Azano and Singh interject legal challenges to the jury instructions or other legal challenges to the § 1519 conviction throughout their arguments. Those are also addressed in the sufficiency section below.

determines whether the evidence, so viewed, "is adequate to allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *Id.* That does not mean a reviewing court asks "itself whether it believes that the evidence at trial established guilt beyond a reasonable doubt, . . . only whether any rational trier of fact could have made that finding." *Id.* The movant bears a "heavy burden." *United States v. Kozeny*, 667 F.3d 122, 139 (2d Cir. 2011).

Section 1519 requires proof that a person (1) knowingly conceals, covers up, falsifies, or makes a false a record, (2) with the intent to obstruct or impede or influence the investigation of any matter, or in contemplation of a matter, that is within the jurisdiction of any department or agency of the United States. 9th Cir. Manual of Model Jury Inst. 8.131A; SER 5225. "The intent of the provision is simple; people should not be destroying, altering, or falsifying documents to obstruct any government function." S. Rep. 107-146 at 15.

a. Culpable Act or Omission

Singh first contends an omission[18]—like the ones in the campaign disclosure forms that did not report Azano's in-kind

---

[18] This argument would not bear on Azano's convictions on Counts 5 through 31, or 33 through 36, because those counts were not predicated on "omissions" but actually false statements that straw donors had provided funds.

donation of Singh's services—cannot form the basis for § 1519 liability because § 1519 lists only affirmative acts (alteration, falsification, destruction) as covered crimes, not omissions. RSOB 38. But as every court to have considered the issue has concluded, § 1519 does cover material omissions—and Singh has not cited a single case holding otherwise. See, e.g., *United States v. Norman*, 87 F. Supp. 3d 737, 745 (E.D. Pa. 2015) (collecting cases). As those cases acknowledge, Congress intended § 1519 to have broad application to reach obstructive conduct relating to any matter within the jurisdiction of a federal agency. See Sarbanes-Oxley Act of 2002, Pub.L. 107-204, Title VIII, § 802(a), July 30, 2002, 116 Stat. 800. Reaching omissions would fulfill those aims. On its face, the terms "conceals" and "covers up," too, minimally reflect Congress's intent to criminalize more than affirmative acts of destruction, alteration or falsification. And it is hard to say how concealing or covering up something is different than omitting it.

This construction finds support in cases that have upheld convictions under an analogous statute for material omissions. Title 18 U.S.C. § 1005 provides that whoever "makes any false entry" in any book, report, or statement of [a] bank. . .with intent to injure or defraud such bank. . .or to deceive any officer of such bank. . .[s]hall be fined. . .or imprisoned. . .or both." Courts have

63

consistently held that a material omission qualifies as a "false entry" within the meaning of that statute. See *United States v. Weidner*, 437 F.3d 1023, 1037 (10th Cir. 2006) ("Under Section 1005, 'an omission of material information qualifies as a false entry.'" (citations omitted); *United States v. Jackson*, 621 F.2d 216, 219 (5th Cir. 1980) ("[a]n omission of material information as well as an actual misstatement qualifies as a false entry under [section 1005])"; *United States v. Harvard*, 103 F.3d 412 (5th Cir. 1997); *United States v. Copple*, 827 F.2d 1182, 1187 (8th Cir. 1987) ("An omission where an honest entry would otherwise be made can be a false entry for section 1005 purposes."). So, too, with § 1519, which expressly covers individuals who "falsify" or make "a false entry" in a record.[19]

Singh next suggests that an omission cannot be criminalized "when there is no duty to" report the information that has been omitted. RSOB 38; RSOB 36 ("Because Mr. Singh did not have a duty to file anything with the City Clerk or the campaigns, he did

---

[19]    The omissions in the campaign finance records also resulted in a "falsified" record in total. While the non-disclosure of Azano's in-kind donation can be called an "omission" of a line item from the disclosure reports, the full report—with the omission—is a false record, as well. That undermines Singh's basis for attacking the conviction based on his "omissions" argument.

not commit any prohibited act or omission under § 1519). But even if Singh had no independent duty to report his donations and expenditures to the City Clerk,[20] Singh is liable for willfully causing the campaign—which bore that duty—to do so. Under well-established law regarding section 2(b) liability, Singh is liable for the omissions he willfully caused from the campaigns' disclosures. See *United States v. Fairchild*, 990 F.2d 1139, 1141 (9th Cir. 1993) (though defendant did not make false statements himself or direct anyone to make false statements, he could be held liable under 18 U.S.C. § 2(b) because of actions that caused false statements to be made to the government); *United States v. Causey*, 835 F.3d 1289 (9th Cir. 1987) (tax preparer may be held liable under § 2 for making a false tax claim when he causes another to file the tax claim); *United States v. Rowland*, 2014 WL 3341690 (D. Conn. July 8, 2014) (explaining section 2b liability for false statements made by a candidate to the Federal Election Commission, which were caused by the defendant, a political consultant, who attempted to conceal his efforts in the campaign); cf. *United States v. Kanchanaluk*, 192 F.3d 1097, 1042 (D.C. Cir. 1999) ("By thus

---

[20]    Courts have premised § 1519 liability on defendants who have no duty to create or retain records at all. *United States v. Kernell*, 667 F.3d 746, 756 (6th Cir. 2012) ("In addition, courts have imposed liability under § 1519 on defendants who clearly had no legal obligation to create or maintain the records at issue.").

causing political committees to report conduits instead of the true sources of donations, defendants have caused false statements to be made to a government agency.").

Singh concedes that the campaigns to which he contributed his services "had a duty to report any indirect services provided to the campaign." RSOB 36. That was well-supported by the evidence introduced at trial. SER 441; see also San Diego Municipal Code §§ 27.2930, 27.2931 (requiring disclosure of campaign contributions, which include, among other things, the "forgiveness of a debt or other obligation to pay for goods or services rendered, or reduction of the amount of the debt or other obligation to pay for goods or services rendered"). The campaign records submitted in this case were also false: they omitted the in-kind donations financed by Azano.

The jury heard sufficient evidence to conclude that Singh willfully caused the campaigns to submit false reports.[21] For

---

[21] The jury instructions required the *Bryan* standard of willfulness: that the defendant "acted with knowledge that some part of his course of conduct was unlawful and with the intent to do something the law forbids." SER 5226. Singh suggests that willful liability under § 2b requires the *Ratzlaf* standard of willfulness, so that the government was obligated to prove that the defendant had "specific knowledge of the reporting requirements and intended to cause them to be evaded." RSOB 46. The case that Singh cites for that proposition, *United States v. Curran*, however, is

example, the jury heard testimony that Dumanis's campaign manager negotiated with Singh about a work proposal for website work. SER 1425-27, 1430-32. But Tierney would not pay the sums that Singh requested. SER 1427, 1431. After a conversation about the legal restrictions on volunteers, SER 1399—including the explicit warning that "if any payments were made, those would

---

distinguishable. 20 F.3d 560 (3d Cir. 1994). There the court assumed that the underlying statute that the defendant was stated to have willfully caused someone else to violate was 18 U.S.C. § 1001. Relying on *Ratzlaf*, the court found that § 1001 itself required "willful" conduct that was in violation of a specific known duty. *Id.* at 567. As a result, § 2(b) liability required the same. Here, for the reasons set forth above, § 30109 does not require *Ratzlaf* willfulness, only proof that the defendant knew his conduct was unlawful.

Azano also challenges the § 1519 willfulness instruction, contending that the competing definitions of knowingly and willfully could have confused the jury, because the knowingly instruction did not require proof that the defendant's acts were unlawful but the willfully instruction required proof that the defendant knew his course of conduct was unlawful and he had the intent to do something that the law forbids. AOB 55; SER 5225-26. Azano never raised this below, so it is reviewed at most for plain error. As Azano acknowledges, the jury is presumed to follow their instructions. There is no doubt that the jury—for a willfully causing theory—had to find willfulness. For a principal, the instruction as provided was accurate. But since the government made clear that it was proceeding on a willful causing theory, that requires the jury to have found the requisite mens rea.

have to be reported to the campaign and we would have to report them on" the campaign disclosure reports, SER 1401—Singh then told Tierney that he would "voluntarily help," so he could "showcase . . . his services" and "break into the San Diego market." SER 1432, 1455. The campaign therefore had no reason to believe that Singh was being paid and that in-kind donations would have to be reported; Singh told them he was simply a volunteer. As Tierney testified "the campaign can only report information that is provided." SER 1466. "If a volunteer is paid by a third party and doesn't tell the campaign, . . . that would cause the campaign to file a [disclosure report] omitting the in-kind contribution." *Id.* The jury certainly had enough on the basis of that testimony to conclude that Singh affirmatively misled the campaign—not simply failed to disclose information to the campaign—to cause it to file a false disclosure report.[22]

---

[22] For this reason, the premise for Amici's brief is mistaken. They suggest that a vendor has no obligation to "volunteer any particular information without a request from a campaign." Amicus Br. at 17. But that says nothing about a vendor—when asked by a campaign—who willfully hides the existence of a third-party that is paying for his services. Under those circumstances, there is no dramatic extension of § 1519 as amici suggest, since that vendor has willfully caused the campaign, through his affirmative misrepresentation, to believe that there are no in-kind donations to report. The amicus brief appears to adopt a version of facts that the

So, too, for the Filner campaign. As the campaign manager, Ed Clancy, testified, he understood that Singh's services would cost between $50,000 to $100,000, an amount that far exceeded the amount that an individual donor could offer with in-kind services. SER 433, 2642. But when he asked Singh about the costs of his services, Singh assured him "don't worry. It's taken care of."

---

jury rejected: that Singh innocently provided services, without attempting to conceal the fact that a foreign national bankrolled his efforts, and as part of a conspiracy to hide Azano as the donor from campaigns. From the premise that Singh engaged in purely innocent conduct, amici fear that § 1519 will ensnare unwitting vendors to campaigns in the future. The feared extension of § 1519 to cover innocent conduct is unfounded. This case will not generate "new state law disclosure obligations for campaign vendors"; "political consultants, pollsters, attorneys, advertising agencies, and others who provide services to campaigns"—but who do not (1) conspire to conceal the identity of a foreign national donor; (2) misrepresent the nature of their services to a campaign to cause a false entry in a disclosure report; and (3) does so to avoid scrutiny in a contemplated investigation that falls within federal jurisdiction (either foreign national contributions or federal elections)—will have nothing to worry about. Amicus Br. at 9-10. No conduct will be chilled, no innocent vendors will be entrapped, particularly since § 2b requires willful conduct, i.e., conduct that the vendor knows is unlawful. And even then, if the conduct does not relate to a matter within federal jurisdiction—for example, a foreign national contributing to campaigns—the vendor can rest easy that federal prosecution is not nigh. But if a vendor does willfully cause a campaign to file a false campaign report and does so to avoid an investigation that falls within federal jurisdiction, §§ 2(b) and 1519 squarely prohibits the conduct.

SER 2644. Indeed, Singh stated that he would provide an invoice for "a small amount of money" for the purchase of websites or website domain names. SER 2645. In other words, Singh would offer cover; a nominal invoice to conceal the fact that he was providing substantially more services than were being financed by a third-party. *Id.* As Clancy testified, he was complicit in the scheme: he "didn't take action on the situation," *id.*, even though he knew the arrangement was unlawful. *Id.* Though he later learned that Azano paid for Singh's services, SER 3162, he worked with Singh, Azano and the other conspirators to hide the fact that Azano's money funded Singh's work. That was adequate to support the jury's verdict.

This is particularly true in light of the evidence that Singh went to pains to hide the nature of his work on the campaigns generally. As explained above, Singh went to great effort to hide the work he did on the Dumanis and Filner campaigns. He used code names, GEX 50-2, 26-16; billed Azano's Mexican company, Broadlink for the work from the billing account for eSolutions R&D. See, e.g., GEX 50-1, 32-4, 32-13P. He reminded others not to openly discuss the in-kind services that ElectionMall provided for Dumanis or Filner. "This subject cannot be emailed." GEX 32-3. "I am not responding to this email. Because of the legal ramifications.

Please talk to me either in person." GEX 48-2. "Please don't have Cynthia or anyone else send things with a code name. And then list the clients name in a email. That is stupid and dangerous for me." GEX 32-8. That evidence—combined with Singh's efforts to mislead the campaign through affirmative misrepresentations or to offer cover with the use of token invoices—was sufficient for a rational juror to conclude that he willfully caused the campaign to submit false campaign disclosure reports.

### b. In Contemplation of an Investigation

Sufficient evidence showed that Azano and Singh committed their § 1519 offenses in contemplation of an investigation.[23] Section

---

[23]    Singh also contends that the § 2(b) instruction excised the requirement that he willfully cause the false entries in the disclosure reports because the jury instructions "could permit the jury to convict if the jury concluded that, but for Mr. Singh's actions, there would have been a more accurate disclosure." RSOB. Singh contends that the instructions contained only a "loose but-for causation" requirement, with a conviction possible "only if the defendant prompted or directed another to commit the offense." RSOB 45. But the instructions provided that a § 2(b) theory of guilt was only possible if he "willfully cause an act to be done which if directly performed by him . . . would constitute the crime of falsification of records related to campaign finance." SER 5226. As the jury heard, the "crime of falsification of records" required proof that the defendant acted with the intent to impede, obstruct, or influence a contemplated investigation of a matter within federal jurisdiction. SER 5225. The jury could not have found guilt without that intent.

1519 does not require a "pending or imminent proceeding or matter" at the time the obstructive conduct is taken. S. Rep. No. 106-146 at 15; *United States v. Kernell*, 667 F.3d 746, 755 (6th Cir. 2012). It requires simply that the obstructive conduct be taken in contemplation of a matter that may occur in the future, with the requisite intent.

As the jury heard, the whole point of the conspiracy was to conceal the fact that Azano was the donor, because the conspirators knew that he could not donate as a foreign national. Singh was well aware of the reporting requirements, since that was his vocation and Dumanis's campaign manager discussed them with him. See also SER 1401, 1460. He was the "campaign guru" and the CEO of ElectionMall, a company that offered a suite of election-related technology for political candidates. SER 1586-87. He specialized in "cutting-edge online fundraising software" to track donations for "legal compliance," meaning he well-understood what reporting requirements governed. GEX 47-21 at 13. He had run ElectionMall since 2003. SER 1580. Singh had also been a candidate for political office in Illinois in the late 1990s. *Id.* He was therefore aware of the "one law . . . that would have impact nationwide," which is the "federal law that restricts the source of contributions . . . coming from foreign nationals." SER 409.

72

As a result, the jury could infer that Singh and his conspirators falsified campaign records, precisely to avoid scrutiny from future investigators who might question a foreign national donating to a United States election. If none of the conspirators cared, or contemplated that the forms would be used by authorities to determine if donors were lawful, then why engage in any of their criminal acts? Azano would have freely donated to Dumanis himself (he did not, SER 427-28); he would have donated openly to the Dumanis PAC, instead of one of his companies, GEX 56-37; despite press about his donation, he would have continued using Airsam for donations (he never did); and instead of asking Marc Chase to cut three checks totaling $180,000, he would have done it himself.[24] The jury was free to infer that the entire point of the conspiracy, and all of the crimes committed in furtherance of it, was to avoid investigative scrutiny. So, too, with Singh, who used code names, strange billing practices, lied to the Dumanis campaign about volunteering, offered a token invoice as cover for the Filner campaign, and told his employees not to discuss, write about, or

---

[24] Each of those actions also supply evidence that Azano caused the campaigns to file false disclosure reports. For the straw donors, they each submitted—at his behest—donation forms with their names on it, not Azano's. He himself did not donate, because he did not want to appear on the disclosure reports.

reveal his work on the campaigns because it was "dangerous" for him.

### c. Investigation Is Within the Jurisdiction of the United States

Finally, Singh contends that there was insufficient evidence that the contemplated investigation fell within the jurisdiction of the United States. RSOB 42-45. As FBI Special Agent Gerry Cook testified, however, election fraud and campaign finance fraud are "matters within the jurisdiction of the Federal Bureau of Investigation." SER 759. For the reasons set forth above, § 30121 (relating to foreign nationals) and § 30122 (relating to straw donations in federal elections) are within Congress's power to regulate.

### D. Sufficient Evidence Supports Singh's Participation in the Single Conspiracy Charged in Count 1[25]

Singh contends that the district court "erred as a matter of law in refusing to instruct the jury that the evidence showed at least two independent conspiracies." RSOB 54. But it was the jury's responsibility, to determine whether the United States had proved the conspiracy charged in Count 1. Indeed, the jury was specifically

---

[25] This section addresses Singh's Opening Brief argument IV, set forth on pages 34-50, Azano's Opening Brief argument III, set forth on pages 53-57.

instructed—consistent with this Court's model jury instructions—

that the jury

> must decide whether the conspiracy charged in Count 1
> of the Indictment existed, and, if it did, who at least
> some of its members were. If you find that the
> conspiracy charged did not exist for the charged Count,
> then you must return a not guilty verdict for that Count,
> even though you may find that some other conspiracy
> existed. Similarly, if you find that any defendant was
> not a member of the charged conspiracy, then you must
> find that defendant not guilty for that Count, even
> though that defendant may have been a member of some
> other conspiracy.

SER 5212; see also 9th Cir. Manual of Model Crim. J. Ins. 8.22

(Multiple Conspiracies).

Liberally construing Singh's claim as an appeal of the denial

of a Rule 29 motion on the issue of multiple conspiracies, "[t]he

question of whether a single conspiracy has been proved, rather

than multiple conspiracies" is "a question of the sufficiency of the

evidence," that is likewise reserved for the jury to answer.[26] *United*

*States v. Bibbero*, 749 F.2d 581, 586 (9th Cir. 1984).

---

[26] This presumes that Singh's conclusory argument is even
adequate to present the claim to this Court. He does virtually no
analysis of the actual evidence presented at trial, simply concluding
that there were no ties between him and the other conspirators.
RSOB 51-54; *Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994).

1. *Standard of Review*: The denial of a Rule 29 motion for acquittal is reviewed de novo, "but the test to be applied is the same as for a challenge to the sufficiency of the evidence." *United States v. Riggins*, 40 F.3d 1055, 1057 (9th Cir. 1994). "[T]he relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

2. A rational trier of fact could (and did) conclude that Singh participated in one overarching conspiracy designed to influence the San Diego mayoral election with Azano's foreign funds and covering up the source of the donations. Despite Singh's best efforts to convince the jury otherwise, SER 4873 ("you need to make sure that the conspiracy you think he's a part of is the conspiracy that is charged in this case"); *id.* ("Whatever it is, Ravi was not involved in one big conspiracy."), the jury appropriately rejected Singh's interpretation of the evidence, finding one overall conspiracy that was agreed-upon by the participants.

"To prove a conspiracy under 18 U.S.C. § 371, the government must first establish: (1) an agreement to engage in criminal activity, (2) one or more overt acts taken to implement the agreement, and (3) the requisite intent to commit the substantive crime." *United*

*States v. Grasso*, 724 F.3d 1077, 1086 (9th Cir. 2013). Although the government must show some actual meeting of minds between the coconspirators, it may do so "through circumstantial evidence that defendants acted together in pursuit of a common illegal goal." *United States v. Grovo*, 826 F.3d 1207, 1216 (9th Cir. 2016). "A formal agreement is not necessary; rather the agreement may be inferred from the defendants' acts pursuant to the scheme, or other circumstantial evidence." *Id.* Coordination between conspirators, for example, "is strong circumstantial proof of agreement." *United States v. Iriarte-Ortega*, 113 F.3d 1022, 1024 (9th Cir. 1997).

To establish the existence of a single conspiracy, rather than multiple conspiracies, the government must prove that an overall agreement existed among the conspirators. *United States v. Bibbero*, 749 F.2d 581, 587 (9th Cir. 1984). But a single conspiracy may involve several "sub-agreements or sub-groups of conspirators." *Id.* In distinguishing single vs. multiple conspiracies, courts consider "the nature of the scheme; the identity of the participants; the quality, frequency, and duration of each conspirator's transactions; and the commonality of time and goals." *Id.*

> A single conspiracy can only be demonstrated by proof that an overall agreement existed among the conspirators. Furthermore, the evidence must show that each defendant knew, or had reason to know, that his

77

> benefits were probably dependent upon the success of
> the entire operation. Typically, the inference of an
> overall agreement is drawn from proof of a single
> objective . . . or from proof that the key participants and
> the method of operation remained constant throughout
> the conspiracy. The inference that a defendant had
> reason to believe that his benefits were dependent upon
> the success of the entire venture may be drawn from
> proof that the coconspirators knew of each other's
> participation or actually benefitted from the activities of
> his coconspirators.

*United States v. Fernandez*, 388 F.3d 1199, 1226 (9th Cir. 2004), modified, 425 F.3d 1248 (9th Cir. 2005). "The evidence need not be such that it excludes every hypothesis but that of a single conspiracy; rather, it is enough that the evidence adequately supports a finding that a single conspiracy exists." *United States v. Kenny*, 645 F.2d 1323, 1335 (9th Cir. 1981).

The evidence was sufficient for a rational jury to infer "an overall agreement" because of "proof of a single objective." The scheme, by its nature, had one overarching goal: inject illegal funds to help install politicians favorably disposed to Azano's business ventures. Azano stood at the hub of the conspiracy; he was not interested in donating for the sake of donating or particularly wedded to any candidate (as his backing of Dumanis first and Filner next would reflect). The conspiracy members understood that their unified efforts to inject foreign money into campaigns supported one

78

aim: the goal of *electing* Azano's chosen politicians and gaining Azano political influence. See *United States v. Otis*, 127 F.3d 829, 835 (9th Cir. 1997) ("one overall agreement to perform various functions to achieve the objectives of the conspiracy"); *United States v. Taren-Palma*, 997 F.2d 525, 530 (9th Cir. 1993) ("Finding multiple conspiracies requires some evidence of separate agreements and purposes.").

The jury repeatedly heard that the overarching goal was to elect politicians to "help him with getting things he needed to get done." SER 910; see also SER 1124 at 29:16-24 ("Wolter told me that if Bonnie Dumanis was to be elected that she would help pave the way for Azano to build a high-end resort in and around downtown San Diego somewhere along the waterfront or so and that she would help cut the red tape and push through permits and the correct zoning area, and I'm sure there's coastal commission issues with buildings downtown that have to be put through the city. So from what Wolter told me, she told Azano she would help expedite that process."). As one witness summarized, "Azano was interested in having a friend in the mayor's office," and in having "influence" to pursue his "large scale development" project. SER 2664; see also 1289-90. That singular objective rationally

79

supports the inference of a single conspiracy. *Fernandez*, 388 F.3d at 1226.

The "method of operation" to achieve that goal remained constant: the conspirators deposited Azano's money, but concealed his identify as the source of the funds. Although some conspirators achieved that through solicitation of individual straw donors (Hester, Chase, for example), or through large straw donations (Chase, Airsam), or as in Singh's case through in-kind services funded by Azano, the efforts to conceal in each were the same. In each instance, the conspirators concealed the true source of the funds for a donation, in order to evade prohibitions designed to prevent foreign meddling in United States elections—Azano's money, but always someone else's name. *Fernandez*, 388 F.3d at 1226 (proof of single conspiracy from "the evidence of a generalized, coherent and consistent scheme"). That "common modus operandi" provided adequate evidence for a rational jury to find the existence of one common scheme. *United States v. Disla*, 805 F.2d 1340, 1349 (9th Cir. 1986) (proof of single conspiracy in part because conspirators used "a common modus operandi (covering up the identity of the participants by use of aliases, i.e., "Cuto," "Angel Garcia," and preventing the tracing of participants by use of the

"blue box" and by individual participants using different addresses)").

In any event, a rational jury could find that the different means of injecting Azano's money into elections (straw donations to PACs, for example) was within the scope of Singh's knowledge and agreement. For example, Singh himself corresponded with Encinas about Azano's effort to "form a PAC[,]" which had "nothing to do with the website work" and in-kind donations that Singh himself conducted. GEX 48-2. Singh refused to discuss PACs with Encinas over email "[b]ecause of the legal ramifications." *Id.* This reference to a PAC offered the jury a rational basis to conclude that Singh understood that other members of the conspiracy pursued different means of achieving their common objective. But this evidence is not even necessary to establish Singh's culpability for joining the single conspiracy in this case. After all, "[i]t need not even be shown that an alleged co-conspirator knew all of the purposes of and all of the participants in the conspiracy." *United States v. Kearney*, 560 F.2d 1358, 1362 (9th Cir. 1977).

The acts of the conspirators enjoyed "commonality of time," as well. *Bibbero*, 749 F.2d at 587. This was not a case involving "two groups of conspirators, two geographic areas, two time spans[.]" *Kearney*, 560 F.2d at 1363. Rather, the conspirators were united in

time and space. The evidence proved the existence of the conspiracy from at least December 2011 to November 2012 (and beyond). Singh's participation spanned the entirety of the conspiracy. As early as December 25, 2011, an email from Bonnie Dumanis to her campaign staff reported that she "got a call, a conference call, from Ernie Encinas, Susumo Azano and Ravi Singh." GEX 24-1. Dumanis reported that Azano wanted Dumanis to "talk to [Singh] because he is a master of Internet campaign stuff." *Id.* Singh flew out on Christmas day to help Dumanis's effort, GEX 26-1, and met with Tierney's political consultant to offer his services. SER 1390-96.

Just as Singh arrived in town, straw donors were funneling Azano's money to Dumanis, as well. Dumanis reported from that first conference call that Azano was "helping to raise money from his family and friends." GEX 24-1. That was accurate. Wolter solicited straw donors on December 21, 2011 "to help Susu and His Father support the soon to be Mayor Bonnie Dumanis." GEX 11-1. Dozens of straw donors eventually agreed, and cut checks in the end of December and beginning of January, just as Singh began to insert himself into the campaign. See e.g., GEX 20-12 (collecting certified copies of checks donated to Dumanis campaign).

Around the time that Singh was billing Azano's Mexican company Broadlink $100,000 for his secret in-kind services for Bonnie Dumanis's campaign ("code name Betty Boob"), GEX 50-2, Azano enlisted Encinas to help Airsam make a straw donation of $100,000 to a Dumanis PAC. GEX 21-13. That donation eventually drew heavy media scrutiny, which Singh as a media-savvy consultant receiving substantial pay for his work on the same campaign undoubtedly saw. SER 1325, 3942.

Singh's work on the Filner campaign also shared "commonality of time" with the straw donations that Chase submitted for $180,000. At trial, the United States introduced evidence of a $120,000 check from South Beach Acquisitions to "San Diegans in Support of Bob Filner for Mayor, 2012," GEX 35-12 at 5, GEX 35-7; and $30,000 in a check from West Coast Acquisitions to the San Diego County Democratic Party. See, e.g., GEX 17-31. The jury heard evidence that Azano funded each of those checks. Marc Chase testified that he owned both companies. In September 2012, Azano personally asked Chase to make additional political contributions at a kitchen table conversation. SER 2771-72. Azano "asked [Chase] to make a contribution. I said how much. He said $180,000. I asked will I be reimbursed and he said yes." *Id*. Azano

83

quickly reimbursed Chase for the contributions, as the jurors saw in GEX 17-32.

As Chase made those straw donations, Singh supplemented support for Filner with his in-kind contributions. Singh drew up the "game plan" for project Plastic Man, see, e.g. GEX 26-16, received $97,000 and $95,000 for his work, GEX 32-4, 32-13P, 32-5, and embedded himself in Filner's campaign headquarter. Singh later boasted that his efforts helped inspire a "decisive victory" for Filner (the singular objective of the conspiracy).

Throughout the conspiracy, the "key participants" remained the same. *Fernandez*, 388 F.3d at 1226. As the Ninth Circuit has observed, "the common participation of key senior [conspiracy] members, [is] another factor supporting the conclusion of a single conspiracy in which senior members of the enterprise coordinated and managed the operations of their subordinates." *Id.* at 1227. So here. Azano (and Encinas) coordinated and managed the operations of all other participants. And those participants—Singh, Chase, Cortes, and Hester—each injected Azano's money into San Diego's 2012 mayoral election in their own way—donor recruitment (Chase, Hester), fund transfer (Chase), facilitating PAC contributions (Chase, Cortes), or in-kind services (Singh). All of these participants had the same goal: election of a San Diego Mayor in

84

2012 who would support Azano's development plans. "The consistency of key personnel and of method and type of operation militates against the separation of these [acts] into smaller, independent conspiracies." *Bibbero*, 749 F.2d at 587. The district court properly denied Singh's motion for acquittal and let the jury conclude that Singh was guilty of participating in a single conspiracy.

E.  The District Court Did Not Abuse Its Discretion in Declining to Sever Singh's Trial From Conspirators' Trials[27]

1.  *Standard of Review*: A properly preserved objection to the district court's denial of a motion to sever is reviewed for an abuse of discretion. *United States v. Fernandez*, 388 F.3d 1199, 1241 (9th Cir. 2004), modified, 425 F.3d 1248 (9th Cir. 2005). "The test for abuse of discretion by the district court is whether a joint trial was so manifestly prejudicial as to require the trial judge to exercise his discretion in but one way, by ordering a separate trial." *Id.*

Singh, however, waived severance as a ground for relief, since he never renewed his request at the close of evidence. See *United States v. Alvarez*, 358 F.3d 1194, 1206 (9th Cir. 2004) ("It is well-settled that the motion to sever must be renewed at the close of evidence or it is waived."); *United States v. Decoud*, 456 F.3d 996,

---

[27]  This section addresses Singh's Opening Brief argument VI, set forth on pages 54-58.

1008 (9th Cir. 2006); *United States v. Free*, 841 F.2d 321, 324 (9th Cir. 1988).

2.    Even if Singh had preserved his claim, the district court did not abuse its discretion in denying Singh's pre-trial severance motion. "Severance under Rule 14 is proper only when the defendant carries the difficult burden of demonstrating undue prejudice resulting from a joint trial." *United States v. Davis*, 663 F.2d 824, 833 (9th Cir. 1981) (citations omitted); *see also United States v. Escalante*, 637 F.2d 1197, 1201 (9th Cir. 1980). To obtain severance, a defendant carries a "heavy burden in demonstrating that their joinder with the other defendants was so manifestly prejudicial that it outweighed the dominant concern with judicial economy." *United States v. Patterson*, 819 F.2d 1495, 1502 (9th Cir. 1987).

Indeed, "Rule 14 does not require severance even if prejudice is shown. . ." *Zafiro v. United States*, 506 U.S. 534, 538-39 (1993) (citations omitted).  Rather, "a district court should grant a severance motion under Rule 14 only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Id.* at 539. The Ninth Circuit has noted that "a joint trial is particularly appropriate where the co-defendants are charged with

conspiracy, because the concern for judicial efficiency is less likely to be outweighed by possible prejudice to the defendants when much of the same evidence would be admissible against each of them in separate trials." *Fernandez*, 388 F.3d at 1242. "The test for determining abuse of discretion in denying severance under Rule 14 is whether a joint trial would be so prejudicial that the trial judge could exercise his discretion in only one way." *Escalante*, 637 F.2d at 1201 (citations omitted).

The district court did not abuse its discretion here. Singh was charged in an overarching conspiracy that included Azano and each of his codefendants. While he contends that he did not personally participate in many aspects of the conspiracy, that is not enough to show an abuse of discretion. Nor it is enough to say that others could be more culpable. As this Court has instructed, a "joint trial with a more culpable defendant is [not] sufficient in itself to require severance." *Fernandez*, 388 F.3d at 1241 (summarizing the holding of *United States v. Baker*, 10 F.3d 1374, 1388 (9th Cir. 1993)).

In any event, the evidence introduced at trial bore on the one single conspiracy that Singh joined. Although he contends that it was in fact separate conspiracies, the jury properly rejected that claim in the light of the evidence introduced at trial. As a result, all of the evidence that came in at trial—with the exception of the gun charge—

was properly considered against Singh. Morevoer, the jury was instructed to consider the evidence against each defendant separately. SER 5200 ("You must decide the case of each defendant on each crime charged against that defendant separately."). The jury heeded that instruction, as evidenced by their inability to come to verdict on some counts and acquittals on others for co-defendant Cortes and their not-guilty verdicts and inability to come to verdict on some counts for Azano's son. R 477, 480. Those defendants were tried with Singh. Yet, the jury either acquitted them of some counts or couldn't come to a consensus.[28] "The prime consideration in assessing the prejudicial effect of a joint trial is whether the jury can reasonably be expected to compartmentalize the evidence as it relates to separate defendants, in view of its volume and the limited admissibility of some of the evidence." *Escalante*, 637 F.2d at 1201 (citations omitted). As the verdicts reflect, the jury was well able to compartmentalize the evidence; they simply found Singh guilty on the basis of it.

---

[28] This also readily disposes of Singh's claim that his due process rights were violated by the misconduct of his co-counsel. RSOB 58-59. Singh never raised that claim below, so it is waived. But even if it were not, the jury's ability to consider each defendant separately shows Singh's rights were not affected by any of Azano's attorney's conduct at trial.

F.  **The District Court Did Not Abuse Its Discretion in Declining to Entertain Azano's Ineffective Assistance of Trial Counsel Claim**[29]

Over the life of this case, Azano has cycled through top-flight attorneys. Azano Presentence Report (APSR) ¶ 186. He started with attorneys from Williams & Connolly, R 5; retained a top San Diego defense attorney, SER 5918; secured the assistance of a former United States Attorney, APSR ¶ 186; and has had no fewer than six lawyers defending him. *Id.* He ultimately settled on a former Assistant United States Attorney with 12 years of prosecution experience, who was a partner at a big law firm and one of the elected Directors for the State Bar of Texas to defend him at trial. SER 5918.

Throughout the trial, Azano made clear that he was deeply involved in the strategic decisions of his defense. See, e.g., SER 44, 3386, 3393, 4206, 5024. That was consistent with his reputation as a controlling businessman. As witnesses testified, Azano is "a very strong businessman, intelligent businessman, an alpha male." SER 907. He controlled his finances, his businesses, he "called the shots." SER 947. "When it came to his businesses," no one could "tell

---

[29]  This section addresses Azano's Opening Brief argument I, set forth on pages 20-43. This claim does not affect his conviction on Count 39, since he was represented by different trial counsel on retrial, after the first jury hung.

Mr. Azano what to do." *Id.* It therefore comes as no surprise that the "aggressive" defense presented at trial was carried out at Azano's instructions. SER 4206.

After the jury returned guilty verdicts on every count, Azano secured new attorneys to assist him at sentencing and with post-trial motions. He then asked the district court for a do-over, contending that his trial attorney delivered ineffective assistance on many of the grounds as he raises on appeal here. SER 5765-89. The United States opposed, noting that the record was insufficiently developed and that discovery on the claim would consume substantial time. SER 5917-5941. The district court agreed, noting its discretion to entertain pre-judgment motions for ineffective assistance of counsel, but also concluding that the "trial record here is not sufficiently developed to enable the Court to resolve the multiple and varied ineffective assistance of counsel claims being asserted by Mr. Azano." ER 48. The district court observed that Azano lobbed "no less than a dozen separate grounds in support of" his claim and that "resolution of the issues asserted" would "require substantial evidentiary development." *Id.* Many of the determinations, the district court explained, "would require . . . an examination of the reasons and motives for certain actions taken or not taken by Mr. Wynne." ER 48-49. The district court stated

that it would be "hard-pressed to make any findings on those issues" as the records stood, ER 49, and that a lengthy evidentiary hearing through "many proceedings" would be required. In the end, the district court concluded that those proceedings "would run afoul of the Court's duty to promote the interest of justice and judicial economy."[30] ER 48. Azano now appeals that discretionary determination and also asks this Court to address his ineffective assistance counsel claims for the first time on appeal.

1. *Standard of Review*: A district court's decision not to entertain a claim of ineffective assistance of counsel is reviewed for an abuse of discretion. *United States v. Steele*, 733 F.3d 894 (9th Cir 2013). This Court ordinarily does not consider ineffective assistance of counsel claims on direct appeal. They can be considered only "where the record is sufficiently developed to permit review and determination of the issue, or the legal representation is so inadequate that it obviously denies a defendant his Sixth Amendment right to counsel." *Id.* at 897.

2. The district court did not abuse its discretion in concluding that the record was insufficiently developed to pass on Azano's claims, and in concluding that the time to develop the

---

[30] Without prejudging the prejudice inquiry, the district court also observed that the analysis "would be a daunting task, to say the least." ER 49.

record was unwarranted. District courts retain wide discretion in determining whether to entertain a prejudgement claim to ineffective assistance of counsel. *Steele*, 733 F.3d at 897. "As the Supreme Court has noted, collateral review typically provides a far better opportunity for an evaluation of an ineffective-assistance claim than direct review,. . . because a factual record . . . can be developed in the district court, including by taking testimony from witnesses for the defendant and the prosecution and from the counsel alleged to have rendered the deficient performance." *United States v. Brown*, 623 F.3d 104, 112 (2d Cir. 2010). The same can be said of fact-intensive claims raised in a motion for a new trial, due to the attendant efficiency costs of developing an adequate record while awaiting sentencing. Where an ineffective assistance of counsel claim is "broad-based and the evidentiary record to consider it [i]s sorely lacking," it is appropriate to defer on the motion, instead of stalling proceedings for time-consuming evidentiary hearings. *Steele*, 733 F.3d at 898; see *United States v. Furminger*, 652 F. App'x 494, 497 (9th Cir. 2016) (unpublished) ("Because Robles's ineffective assistance of counsel claim was 'broad-based and the evidentiary record to consider it was sorely lacking,' the district court did not abuse its discretion in declining to consider it."); *United States v. Jackson*, 546 F. App'x 643, 645 (9th Cir. 2013)

92

(unpublished) ("The district court did not abuse its discretion in denying Jackson's Rule 33 motion, because the basis for the motion was ineffective assistance of counsel, which was not apparent on the record."). A court therefore may decline to consider a post-trial ineffective assistance of counsel claim where the "interests of justice and judicial economy" would not "be served by delaying the trial proceedings to conduct an immediate hearing on an under-developed motion." *Steele*, 733 F.3d at 899.

To establish a deprivation of the Sixth Amendment right to the effective assistance of counsel, a defendant must satisfy a two-part standard. First, he must show that counsel's performance was so deficient that it "fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 686 (1984). "[T]he purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation ... [but] simply to ensure that criminal defendants receive a fair trial." *Id.* at 689. Thus, "[t]he benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Id.* "There are countless ways to provide effective assistance in any given case," and that "[e]ven the best criminal defense attorneys

would not defend a particular client in the same way." *Id.* A court evaluating a claim must "begin with the premise that 'under the circumstances, the challenged action [ ] might be considered sound trial strategy.'" *Cullen v. Pinholster*, 563 U.S. 170, 191 (2011) (quoting *Strickland*, 466 U.S. at 689). The court must examine and "affirmatively entertain the range of possible reasons . . . counsel may have had for proceeding as they did." *Pinholster*, 563 U.S. at 195. "Wide latitude" is afforded counsel in making tactical determinations. *Strickland*, 466 U.S. at 689.

Second, a defendant must show that the attorney's alleged deficient performance prejudiced the defense. That requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. That requires a "substantial," not just "conceivable," likelihood of a different result. *Pinholster*, 563 U.S. at 189.

Ineffective assistance claims that challenge tactical decisions can require substantial evidentiary development. The record must show "what counsel did, *why it was done*, and what, if any, prejudice resulted." *United States v. McGowan*, 668 F.3d 601, 605 (9th Cir. 2012) (emphasis added). That often requires an opportunity to

94

obtain documents from and examine the attorney challenged as ineffective, after the attorney-client privilege is deemed waived. See, e.g., *Brown*, 623 F.3d at 112.

As the district court observed, Azano's post-trial motion posed "no less than a dozen separate" grounds, amounting to a disagreement with nearly every strategic decision reached by his trial counsel. ER 48. The starting "premise" is that "the challenged action [ ] might be considered sound trial strategy." *Pinholster*, 563 U.S. at 191. And because the record does not establish "*why*" certain strategic decisions were made, *id.*, the district court appropriately concluded an evidentiary hearing would be required. ER 48-49. Below, Azano's attorneys agreed. ER 48. That hearing would have consumed substantial time and resources. The district court would have had to consider the terabytes of discovery that the United States produced, to evaluate whether the decisions counsel made in light of it was minimally competent. SER 5931. The district court would also have to find that Azano waived any attorney client privileges by bringing his motion, and permit the parties to conduct extensive discovery relating to trial counsel's decisions.

The district court did not abuse its discretion deferring consideration of the claims in the "interests of justice and judicial economy." ER 48. Because the "interests of justice and judicial

95

economy" would not "be served by delaying the trial proceedings to conduct an immediate hearing on an under-developed motion," the district court did not abuse its discretion in declining to consider the ineffective assistance of counsel claims. *Steele*, 733 F.3d at 899. For the same reasons, the record is inadequate for appellate review of trial counsel's performance.

3.    Even if Azano could ask this Court to review his claims in the first instance, Azano has not established on this record that his attorney was constitutionally deficient. As the United States explained below, the carousel of attorneys Azano dispatched in his defense faced a hopeless task. The terabytes of discovery and thousands upon thousands of pages of investigative reports conclusively established that he conspired with others to willfully flout foreign money and straw donor limits on United States elections and to conceal and cover up his wrongdoing. Each of the attorneys he retained faced bleak options: present one unconvincing defense to the jury or present another equally unconvincing defense to the jury. The strategic decision to pick one of two (or more) meager defenses is no indictment of his trial counsel. It is attributable, instead, to the insurmountable evidence of Azano's guilt developed by the United States.

96

> The hopelessness of some cases may even relegate the most competent defense counsel to the role of official hand-holder. The Sixth Amendment does not hold an attorney responsible for the difficulty of the case he inherits. The choice to pursue a bad strategy makes no comment on an attorney's judgment where no better choice exists.

*Hendricks v. Calderon*, 70 F.3d 1032, 1042 (9th Cir. 1995). Azano may now be disappointed with the jury's verdicts, but it was through no fault of his "hand-holder[s]." Although Azano contends that no strategic decision or determination could support trial counsel's performance, there is a sufficient basis to reserve the issues for collateral review, as the United States argued below. See, e.g., SER 5932-40.[31]

Regardless, no matter the claimed error, Azano cannot show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The evidence was overwhelming. Counsel's decision "to pursue [what post-trial counsel calls] a bad strategy makes no comment on an attorney's judgment where no better choice exists." *Calderon*, 70 F.3d at 1042.

---

[31] The United States does not waive arguments by not addressing every claim. But this record is factually undeveloped, and discovery and an evidentiary hearing would be required to rebut them all.

G.    Section 922(g)(5)(B) Covers Entrants to the United States on B1/B2 Visas Is Not Unconstitutionally Vague[32]

In January 2014, agents with the FBI executed a search warrant at Azano's home, to look for evidence of the campaign finance fraud offenses. APSR ¶ 54. During the search, Azano advised agents that he had a firearm in his closet and led them to it. *Id.* Agents seized the firearm, a black Sig Sauer P225 with a fully loaded magazine. APSR ¶ 55. Azano was charged in Count 39 with unlawfully possessing the firearm, as an alien admitted to the United States on a non-immigrant visa. ER 34. Pretrial, Azano moved to dismiss the offense, challenging the statute as unconstitutionally vague. SER 5451-66. The United States opposed, SER 5552-5578, and the district court denied the motion. Azano proceeded to trial and the jury deadlocked on the count during the first trial, but convicted Azano after a retrial. APSR ¶¶ 6, 8. Azano now appeals the district court's denial of his motion to dismiss.

1.    *Standard of Review*: A district court's interpretation of a statute and whether it is unconstitutionally vague is reviewed de novo. *United States v. Robertson*, 875 F.3d 1281, 1286 (9th Cir. 2017).

---

[32]    This section addresses Azano's Opening Brief argument V, set forth on pages 57-60.

2.    Section 922(g)(5)(B) provides that it is unlawful to possess a firearm if the person is

> (5) . . . an alien----
>> (B)    except as provided in subsection (y)(2), has been admitted to the United States under a non-immigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. § 1101(a)(26)).

A non-immigrant visa, in turn, is defined as a "visa properly issued to an alien as an eligible nonimmigrant by a competent officer." 8 U.S.C. § 1101(a)(26). A nonimmigrant is an alien "having a residence in a foreign country which he has no intention of abandoning and who is visiting the United States temporarily for business or temporarily for pleasure[.]" 8 U.S.C. § 1101(a)(15)(B). Temporary visitors enter the United States on visas for "business" (B1) or for "pleasure" (B2). 22 C.F.R. § 41.31(a)(1). Federal regulations provides that B1/B2 visas permit entrants to engage in "legitimate activities of a recreational character, including tourism, amusement, visits with friends or relatives, rest, medical treatment, and activities of a fraternal, social, or service nature" 22 C.F.R. § 41.31(b)(2). There is no dispute that a B1/B2 visa is a non-immigrant visa, or that Azano entered the United States on a B1/B2 visa. SER 96, 98.

Azano contends that he nonetheless is excluded from the class of prohibited aliens set forth in 18 U.S.C. § 922(g)(5)(B) because of the exceptions contained in § 922(y)(2). Subsection (y)(2) titled "Exceptions" provides that (g)(5)(B) does "not apply to any alien who has been lawfully admitted to the United States under a nonimmigrant visa, if that alien is . . . (A) admitted to the United States for lawful hunting or sporting purposes or is in possession of a hunting license or permit lawfully issued in the United States."[33] 18 U.S.C. § 922(y)(2). Azano has never claimed that he possessed a hunting license or permit, or that he was engaged in any hunting activities. But according to Azano, the "sporting purpose" exception covers his B1/B2 visa, since a B1/B2 visa permits "legitimate activities of a recreational character." AOB 58. In short, he equates sporting purpose with recreation, so all visitors to the United States for pleasure are exempted from the statute.

That is an untenable interpretation of "sporting purpose" and the district court properly rejected it. The term "sporting" in the statute, when read in context and defined alone, applies to lawful activities in which firearms are used. See, e.g., Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/sporting

---

[33] Section 922(y) sets forth affirmative defenses, not elements of the offense. Cf. *United States v. Gravenmeir*, 121 F.3d 526, 528 (9th Cir. 1997).

(last visited August 7, 2017) (definition of "sporting" – "of, relating to, used, or suitable for sport; especially trained for trapping or retrieving game · sporting dogs"). As the plain language conveys, "admitted . . . for lawful hunting or sporting purposes" means admitted to the United States in order to hunt (that is, shoot at animals), or to participate in sporting activities that involve guns, such as target shooting, or trap and skeet shooting.

Beyond the plain words of the statute, the legislative history confirms that the exception was designed to apply in limited circumstances where an alien was lawfully admitted for a hunting or hunting-like purpose. As the legislative history explains, the exception applies

> [I]f you are someone who has come to the United States for lawful hunting or sporting hunts—so you have someone who enjoys hunting and can legally do so in the United States, who comes here for that purpose, goes to the far west, wherever it might be, that person is exempt. That person may purchase a gun while here for that purpose.

Congressional Record—Senate, S.Amdt. 3240, S8641 (July 21, 1998) (emphasis added); *id.* at S8642. There was no belief that the "sporting" exception would swallow the entire class of aliens that the statute was enacted specifically to cover. Under Azano's expansive reading of "sporting purpose," no visitors for pleasure

would be covered by the statute, even though it was specifically passed to cover those visiting tourists. See *New York State Dept. of Social Servs. v. Dublino*, 413 U. S. 405, 419–420 (1973) ("We cannot interpret federal statutes to negate their own stated purposes.").

Azano contends that the straightforward reading of the statute then renders the statute vague. AOB 60. But Section 922(g)(5)(B) straightforwardly applies to all aliens who have been "admitted to the United States under a non-immigrant visa." A person of ordinary intelligence would understand. So, too, with the exceptions contained in § 922(y)(2). A person of ordinary intelligence would understand that the "sporting purpose" exemption applies to sport involving guns or hunting, too, and that it could not be read to virtually eliminate the prohibition on nonimmigrant firearm possession set forth in section 922(g)(5)(B).

## CONCLUSION

The convictions should be affirmed.

Respectfully submitted,

ADAM L. BRAVERMAN
   *United States Attorney*

S/ HELEN H. HONG
   *Assistant U.S. Attorney*
   *Chief, Appellate Section*
   *Criminal Division*

OCTOBER 25, 2018.

102

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the word limitation established by separate Court order dated October 4, 2018 and contains 21,746 words.

2. This brief complies with the typeface requirements of Fed. R. App. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface, 14-point Century Schoolbook, using Microsoft Word 2016.

## STATEMENT OF RELATED CASES

The United States is not aware of any related cases.

s/HELEN H. HONG
*Assistant U.S. Attorney*

OCTOBER 25, 2018.

ADDENDUM

## 18 U.S.C. § 922(g)(5)

(g) It shall be unlawful for any person--

  (5) who, being an alien--

  (A) is illegally or unlawfully in the United States; or

  (B) except as provided in subsection (y)(2), has been admitted to the United States under a nonimmigrant visa (as that term is defined in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)))

## 18 U.S.C. § 922(y)(2)

(y) Provisions relating to aliens admitted under nonimmigrant visas--

  (1) Definitions.--In this subsection--

  (A) the term "alien" has the same meaning as in section 101(a)(3) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(3)); and

  (B) the term "nonimmigrant visa" has the same meaning as in section 101(a)(26) of the Immigration and Nationality Act (8 U.S.C. 1101(a)(26)).

  (2) Exceptions.--Subsections (d)(5)(B), (g)(5)(B), and (s)(3)(B)(v)(II) do not apply to any alien who has been lawfully admitted to the United States under a nonimmigrant visa, if that alien is--

  (A) admitted to the United States for lawful hunting or sporting purposes or is in possession of a hunting license or permit lawfully issued in the United States;

A1

## 18 U.S.C. § 1519

Whoever knowingly alters, destroys, mutilates, conceals, covers up, falsifies, or makes a false entry in any record, document, or tangible object with the intent to impede, obstruct, or influence the investigation or proper administration of any matter within the jurisdiction of any department or agency of the United States or any case filed under title 11, or in relation to or contemplation of any such matter or case, shall be fined under this title, imprisoned not more than 20 years, or both.

## 52 U.S.C. § 30109(d)

(d) Penalties; defenses; mitigation of offenses
    (1)(A) Any person who knowingly and willfully commits a violation of any provision of this Act which involves the making, receiving, or reporting of any contribution, donation, or expenditure--
        (i) aggregating $25,000 or more during a calendar year shall be fined under Title 18, or imprisoned for not more than 5 years, or both; or
        (ii) aggregating $2,000 or more (but less than $25,000) during a calendar year shall be fined under such title, or imprisoned for not more than 1 year, or both.

## 52 U.S.C. § 30121

(a) Prohibition
    It shall be unlawful for--
    (1) a foreign national, directly or indirectly, to make--
        (A) a contribution or donation of money or other thing of value, or to make an express or implied promise to make a contribution or donation, in connection with a Federal, State, or local election;

A2

(B) a contribution or donation to a committee of a political party; or

(C) an expenditure, independent expenditure, or disbursement for an electioneering communication (within the meaning of section 30104(f)(3) of this title); or

(2) a person to solicit, accept, or receive a contribution or donation described in subparagraph (A) or (B) of paragraph (1) from a foreign national.

(b) "Foreign national" defined

As used in this section, the term "foreign national" means--

(1) a foreign principal, as such term is defined by section 611(b) of Title 22, except that the term "foreign national" shall not include any individual who is a citizen of the United States; or

(2) an individual who is not a citizen of the United States or a national of the United States (as defined in section 1101(a)(22) of Title 8) and who is not lawfully admitted for permanent residence, as defined by section 1101(a)(20) of Title 8.

## 52 U.S.C. § 30122

No person shall make a contribution in the name of another person or knowingly permit his name to be used to effect such a contribution, and no person shall knowingly accept a contribution made by one person in the name of another person.

A3

9th Circuit Case Number(s) | 17-50337, 17-50387

**NOTE:** To secure your input, you should print the filled-in form to PDF (File > Print > *PDF Printer/Creator*).

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) Oct 25, 2018 .

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format) | s/Helen H. Hong

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE
### When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on (date) .

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format) |